UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                              CASE NO. 3:22-cr-23-BJD-MCR

AARON ZAHN
RYAN WANNEMACHER
_____/

**UNITED STATES' RESPONSE TO DEFENDANT
WANNEMACHER'S MOTION TO ESTABLISH
PROCEDURES FOR *GARRITY* MATERIALS**

The United States of America, via the undersigned, responds to

Defendant Ryan Wannemacher's Motion to Establish Procedures for Service

of *Garrity*[1]  Materials (Doc. 61). The Prosecution Team[2]  has not read or

reviewed the Office of General Counsel (OGC) compelled interviews of

former Jacksonville Electric Authority (JEA) CEO Aaron Zahn and former

CFO Ryan Wannemacher, and does not intend to do so. As previewed in the

---

1  *Garrity v. New Jersey*, 385 U.S. 493 (1967).

2  The Prosecution Team has consisted of Assistant United States Attorney Tysen Duva, FBI
Special Agents Robert ("Bobby") Blythe and Angela Hill, and State Attorney's Office (SAO)
Investigators Timothy Adams and John Zipperer. Investigator Adams left the SAO in late
July 2021, and from that point forward was not involved in the investigation and
prosecution. Investigator Zipperer retired from the SAO as a full-time investigator in May
2020, but remained engaged in a part time status and assisted the Prosecution Team during
the investigation through the grand jury returning the Indictment on March 2, 2022.

1

original motion that Wannemacher filed addressing this issue – the Unopposed Motion to Continue Trial (Doc. 43) – Wannemacher intends to ask the Court for extraordinary relief regarding *Garrity* compelled interviews that the Prosecution Team has never read or reviewed. That motion advised the Court that Wannemacher intends to seek dismissal of the Indictment and disqualification of the Prosecution Team. *Id.* That ultimate result is what Wannemacher seeks to set up with the present motion to establish *Garrity* procedures.

The government does not oppose certain *Garrity* procedures, and even agrees that the Court should take the immediate step of reviewing the compelled Garrity statements given by Zahn and Wannemacher *in camera*, without Government involvement. At this juncture, the Prosecution Team has no interest in reviewing those interviews. The Government uses this responsive pleading to set forth suggestions to the Court (with the benefit of background facts) as to how the Court may elect to handle the review procedures.

## MEMORANDUM

### I.    Background

The federal investigation into whether illegal activity occurred during the Invitation To Negotiate (ITN) involving the potential privatization or sale of JEA began in January 2020. On December 17, 2019, the JEA Board placed Aaron Zahn on administrative leave for multiple reasons, including Zahn's alleged misrepresentations and omissions to the JEA Board and Compensation Committee about the Performance Unit Plan (PUP), which is the incentive bonus plan that the federal investigation and grand jury ultimately focused on. On December 24, 2019, the ITN was cancelled, and the exploration of privatizing or selling JEA ended. Aaron Zahn was terminated with cause on January 28, 2020. Ryan Wannemacher was provided notice of his termination on December 27, 2019.

According to the motion, Wannemacher gave sworn testimony to OGC on January 3, 2020. The Prosecution Team has not read that transcript. During the very early days of the investigation, when the Prosecution Team began collecting various transcripts of OGC interviews, OGC provided Wannemacher's *Garrity* compelled statement to the Prosecution Team. This occurred on or about January 15, 2020. When the undersigned received this

batch of transcripts and realized Wannemacher's *Garrity* statement was in the production, the undersigned advised the Prosecution Team not to review it. In January 2020, the Prosecution Team did not have a clear understanding of the depth of Ryan Wannemacher's involvement with the PUP. At that point, the federal investigation was in its infancy.

Days later (January 21 and 22, 2020), Aaron Zahn gave a compelled *Garrity* statement. The Prosecution Team has not read or reviewed that statement. These statements were disseminated by the news media and placed on the internet as early as February 2020. The undersigned advised the Prosecution Team to avoid articles pertaining to anything Zahn and Wannemacher said during their compelled *Garrity* interviews.

The Prosecution Team did not employ a filter team to review the *Garrity* statements, as there was no reason to do so. The Prosecution Team was not involved in taking the statements, never read them, and knew from the beginning that they would not be a part of the Prosecution Team's effort in gathering information during the grand jury investigation. The Prosecution Team did not discuss the statements with any witness, or otherwise use the statements in any fashion during the investigation. The plan (which was implemented) was not to review them at all, and not to include any

4

information from the statements in any interviews with witnesses. Other than potentially reading the statements, there was nothing for a filter team to do in February 2020, as the federal investigation had only just begun. It did not seem to make sense to employ a filter AUSA and FBI Agent to review the statements. Because the investigation was in its earliest stages, there was nothing that a filter AUSA or FBI agent could have added by reviewing the statements to somehow guide the investigation appropriately.

In January and February 2020 (prior to Covid-19 pandemic related shutdowns), the Prosecution Team interviewed approximately eleven witnesses, none of which involved discussions of any *Garrity* compelled testimony. When Covid-19 related shutdowns began in mid-March 2020, the Prosecution Team was forced to cease interviews. In March and April 2020, the undersigned and FBI agents spent hours watching JEA Board Meetings from 2018 and 2019 on the internet, and reading statements provided by witnesses (none of which included *Garrity* compelled testimony of Wannemacher or Zahn, or discussions about such testimony). It was during this process of watching JEA Board Meetings that the criminal investigation began to focus on the development of the PUP in connection with privatization efforts during the ITN.

In late April 2020 (when it was still unclear how long Covid-19 pandemic related lock down protocols would continue), the Prosecution Team began performing phone and virtual interviews with witnesses to further the grand jury investigation. This continued throughout 2020. None of this involved any use of the defendants' *Garrity* statements. As the investigation progressed, it became more evident that if JEA was privatized during the ITN process and sold for an amount that would net the City of Jacksonville (COJ) between $4 and $6 billion dollars, certain JEA executives (including Zahn and Wannemacher) would have stood to make tens of millions of dollars (while being public sector employees and owing a fiduciary duty to the COJ).

In December 2020 (once the Jacksonville Division had greater access to the federal grand jury), the Prosecution Team began its grand jury investigation that spanned from early December 2020 through the return of the Indictment on March 2, 2022. During this entire process, the Prosecution Team interviewed over 80 witnesses, and in addition to the two FBI Agents, placed 23 additional witnesses before the grand jury. At no point did the Prosecution Team delve into or ask questions about anything that Aaron Zahn or Ryan Wannemacher testified to during their *Garrity* compelled interviews. The entire grand jury record does not contain any reference (even opaquely) to

these statements.

On December 16, 2019, both defendants made public and unprotected statements during the hearing conducted by City Council Members Rory Diamond and Ron Salem, which became known as the "Diamond/Salem Hearing." Zahn and Wannemacher voluntarily answered questions during that hearing - - testimony which was not compelled or the subject of any protections.

During this recorded hearing, which the Prosecution Team reviewed at the outset of the investigation, Zahn and Wannemacher answered questions about the PUP. The following are certain excerpts:

- Zahn stated that he "made an error in judgment…. The motives of the long-term employee plan at inception were pure, but the moment that JEA's Board contemplated recapitalization, I as the CEO should have recommended that the long-term performance plan would be better timed after a final decision was made for JEA's future. Instead, JEA's leadership continued the mechanics of legal, ethical, and confirmatory diligence around this long-term plan. The delay in cancelling this plan and the contemplation of potential impacts of recapitalization on the plan were my mistake. In consultation with OGC and advisors between August and the end of October, JEA's leadership arrived at the correct conclusion…."

- When asked who "pulled the trigger" on the "PUP plan," Zahn stated that he did not know. Wannemacher said the same. Subsequently, Zahn changed course and said, "Yeah, I signed off on that [the PUP]."

- Council Member Diamond asked, "Who else was involved, do you know, with the evaluations of the PUP plan up until June 18? Can you

7

just kinda' list off people who might've been involved, or you know were involved?"

- o Zahn answered, "Sure so, Board members. I keep them apprised of the work that the staff does on a weekly basis oftentimes – if not weekly, once every other week to give them an update in terms of on how staff and consultants are performing on directives that they've provided…. The Compensation Committee at the time…myself, Ryan Wannemacher, Angie Hiers, Pat Maillis, Willis Towers Watson…. I'm sure there were a lot of people that were being consulted with on different aspects based on their functional area."

- o Council Member Diamond stated, "What I'm trying to figure out here is at some point we get an equation that says how you value each PUP, and I'm trying to figure out if that equation has been created yet, Mr. Wannemacher, do you know?"

- o Wannemacher responded, "I don't recall at this time if that equation had been formulated yet."

- o Council Member Diamond asked, "Were you looking at the math behind this plan at this point?"

- o Wannemacher answered, "I don't know that we had determined anything other than a broad sizing at this point in the record."

- o Council Member Diamond asked, "What does that mean, 'broad sizing'?"

- o Wannemacher explained, "In terms of the total kind of annual compensation – the target for the $3.4 million that's referenced here. And by the way, I think this was a reference point. I don't know that this was where we ended up ultimately in the context of the conversion."

- o Council Member Diamond followed up, asking, "So, there wasn't a calculation that spit out $3.4 million, it was a target?"

- o Wannemacher replied, "I believe so, at this time."

- Council Member Salem asked, "Who put the PUP on the July 23rd agenda?"

  - o Zahn responded, "Myself, the entire senior leadership team, and OGC review all Board documents before they get submitted, as well as the other individual Board members will review the materials ahead of time so that they're familiar with the materials prior to receiving them as a complete package."

  - o Council Member Salem asked, "Do you know when the Board packet for this particular meeting was completed?"

  - o Zahn answered, "I don't know."

  - o Council Member Salem followed up, "I've spoken to several Board Members who have reached out to me, they tell me they got it late-Friday prior to the Tuesday meeting. Do you know if the Board Members were briefed on the PUP plan prior to the meeting?"

  - o Zahn answered, "Yes, it's a practice to talk to individual Board members and make them apprised of significant elements that are coming up at Board meetings."

  - o Council Member Salem stated, "I understand that's the practice, and I was told that normally occurs – for this meeting, though, I'm talking about."

  - o Zahn responded, "From my recollection, yes. I don't recall deviating from that practice."

- Later in the hearing, Wannemacher described the PUP as of July 23, 2019 as a "draft," even though the JEA Board approved the plan prospectively. Wannemacher then admitted that even as of mid-

9

November 2019, the PUP had no cap, and that the Council Auditor was "correct" about that.

- Later in the hearing, Council Member Salem pressed Wannemacher on whether he performed "specific calculations."

  o Council Member Salem stated, "I mean specific numbers…. Did you perform any calculations yourself?"

  o Wannemacher answered, "So, we did provide those calculations to the Council Auditor."

  o Council Member Salem asked, "But prior to it being presented to the Board, prior to July 23, did you perform those calculations? Either on a legal pad or on a white board in your office, or somewhere?"

  o Wannemacher stated, "Yeah, I think at some point along the way I looked at the expected forecast and ran those numbers. I don't know that I – frankly, the formula itself is relatively straightforward as it relates to the calculation. It's straight out of our financial statements and its direct line items. So, it's not a complicated spreadsheet necessarily…."[3]

There were other exchanges regarding the PUP during the Diamond/Salem hearing. These excerpts are provided as illustrative examples.

---

[3] These exchanges spanned various times throughout time stamps 7:50 to 1:15:35 during the Diamond/Salem Hearing. When the Motions to Dismiss and Sever are filed, the Government intends to mark a CD containing this Hearing as an Exhibit and file it with the Court.

## II.     Argument

### A. Motion to Sever

The importance of the public statements that Zahn and Wannemacher made during the December 16, 2019 Diamond/Salem hearing regarding the PUP is that the *Garrity* statements are not the "sole source" or "sole evidence" of the statements that Zahn and Wannemacher made about the PUP. This will be critical to the analysis when Wannemacher files the motion to sever discussed in page eight of the instant motion. *See United States v. Cobb*, 185 F.3d 1193, 1197-98 (11th Cir. 2005) (abrogated on other grounds) (referencing the "sole evidence" doctrine as being present in "one of those rare cases" that may require severance). The Government believes that this case *will not* prove to be "one of those rare cases." While the Government is unaware of what Zahn and Wannemacher stated in their *Garrity* interviews, if the statements were consistent with the multiple statements made during the December 16, 2019 Diamond/Salem hearing, the *Garrity* statements are not the "sole evidence" on the issue. This will significantly impact the severance analysis.[4]

---

[4] The Government provides this information to preview the issue based on Wannemacher's stated intention beginning on page eight of his motion to file a motion to sever at a later time based primarily on his intended use of Zahn's *Garrity* statement at trial. When Wannemacher files the substantive motion, the Government will respond in greater detail.

The Government agrees that the Court should review the *Garrity* statements *in camera* and compare them to the public statements that both Zahn and Wannemacher made during the Diamond/Salem Hearing. If the statements are substantially similar, then this begs two questions: (1) "why would Wannemacher be entitled to a severance?"; and (2) "even if the Government knew the contents of the *Garrity* statements (which it does not), how could the Government make improper derivative use of *Garrity* statements when the defendants said substantially the same things to the general public during the Diamond/Salem Hearing prior to making the *Garrity* statements?"

**B.  Motion for a *Kastigar* hearing**

Wannemacher correctly cites *Kastigar v. United States*, 406 U.S. 441 (1972) as the Supreme Court's seminal decision on tainted/untainted derivative use of a defendant's immunized statement, and signals to the Court that he intends to seek dismissal of the Indictment and removal of the Prosecution Team. The appropriate procedure would be for Wannemacher to file a motion for a *Kastigar* hearing. As an initial matter, Wannemacher cannot even establish that any individual on the Prosecution Team ever read Wannemacher's (or Zahn's) *Garrity* statement. The defendant goes too far

with signaling to the Court that he intends to seek extraordinary remedies, including removal of the Prosecution Team. Wannemacher has no legitimate basis to make such a sweeping allegation. Wannemacher engages in the quantum leap that because the media obtained the *Garrity* statements pursuant to public records requests and they were later posted on the internet, the entire Prosecution Team should be excluded from the case. If the Court so held, no prosecutor or agent in the Middle District of Florida (or anywhere) could prosecute Aaron Zahn or Ryan Wannemacher. The defendants cannot cite any law for the proposition that because their *Garrity* statements were made public, they are essentially entitled to transactional immunity. As set forth below, the Supreme Court in *Kastigar* specifically rejected that outcome.

When the government seeks to prosecute a witness who previously has given self-incriminating testimony pursuant to a grant of immunity, serious Fifth Amendment questions are raised. In *Kastigar*, the Supreme Court held that such a prosecution was allowable, but the prosecution is prohibited from "using the compelled testimony in *any* respect" that would "lead to the infliction of criminal penalties on the witness." 406 U.S. at 453. The Court specifically rejected the position that once compelled immunized testimony was given, the witness must be granted full transactional immunity. Therefore,

13

when presented with a *Kastigar* challenge, a court's task is to determine whether any of the evidence used against the defendant was in any way derived from his compelled immunized testimony. Once a defendant shows that he has testified under immunity about matters germane to the criminal prosecution, the prosecution has the burden of showing that its evidence is not tainted. *Id.* at 460. This entails establishing the existence of an independent, legitimate source for the disputed evidence. *Id.*

To establish a "wholly independent" source, the government must demonstrate that each step of the investigative chain through which the evidence was obtained is untainted. *United States v. Hampton,* 775 F.2d 1479, 1489 (11th Cir.1985). This includes an affirmative showing that none of the evidence presented to the grand jury was derived directly or indirectly from the immunized testimony. *Id.* at 1486.

Although the government's task has been characterized as a "heavy burden," it is clear that the government is required to prove an absence of taint only by a preponderance of the evidence. *United States v. Byrd,* 765 F.2d 1524, 1529 (11th Cir.1985). Negation of all abstract possibility of taint is not necessary. *Id.* The Eleventh Circuit has adopted the "evidentiary" interpretation of *Kastigar*, that is the focus of a challenge on self-incrimination

14

grounds should be on the direct and indirect evidentiary uses of immunized testimony, rather than on non-evidentiary matters such as the exercise of prosecutorial discretion. *Id.* at 1529-31 (disagreeing with *United States v. Semkiw,* 712 F.2d 891 (3d Cir.1983), and *United States v. McDaniel,* 482 F.2d 305 (8th Cir.1973)). Finally, even if immunized testimony was in fact used, an indictment or conviction may be upheld on a finding that the use of such tainted evidence was harmless beyond a reasonable doubt. *Id.* at 1529 n. 8. This process can include *in camera* submissions (including the *Garrity* statements themselves) so that the Court can review them to aid its determination. *See Byrd*, 765 F.2d at 1529*; see also United States v. Sockwell,* 699 F.2d 213, 217 (5th Cir.1983); *Little Rock School District v. Borden, Inc.,* 632 F.2d 700, 705 (8th Cir.1980); *United States v. Bianco,* 534 F.2d 501, 509, n. 11 (2d Cir.1976).

While Wannemacher may be entitled to seek a *Kastigar* hearing, the Government conducted the grand jury investigation in a manner to remain taint free throughout. For example, during the investigation (without using any information gleaned directly or derived from the *Garrity* statements), the Prosecution Team unearthed evidence that as early as March 18, 2019, Wannemacher prepared an Excel spreadsheet titled "Performance Unit

Scratch Sheet.xlsx" and performed Long Term Incentive (LTI) PUP calculations using JEA's financial statements from 2016 through 2018 that added $4 billion to JEA's Book Value for 2018. *See* Indictment, ¶ 20a. This significantly calls into question Wannemacher's veracity during the Diamond/Salem Hearing. In response to Councilman Diamond's question about the PUP formula prior to the June 18, 2019 Compensation Committee meeting, Wannemacher said, "I don't recall at this time if that equation had been formulated yet."

The investigation further revealed that (again without using any information from *Garrity* statements or in any derivative fashion) on or about July 11, 2019, Wannemacher finalized the LTI PUP tethered to the privatization of JEA. Wannemacher crafted the PUP formula in connection with the minimum requirements that Aaron Zahn designed for a successful bid to purchase JEA, such that substantial payouts to certain JEA executives (including Zahn and Wannemacher) were a certainty if JEA was privatized or sold. *Id.* at ¶ 20j.

These two facts are critical and illustrative, as the Government seriously doubts that Wannemacher can point to any public reporting of these alleged facts based on the *Garrity* statements, or otherwise. So, if Zahn and

Wannemacher hid these alleged facts and did not divulge them during *Garrity* statements, this begs the question of "how could the Government make derivative use of information Zahn and Wannemacher did not provide?" This highlights the fallacy in Wannemacher's expected *Kastigar* arguments, that is, how can Wannemacher's *Garrity* statement simultaneously be both exonerating as to his involvement with the PUP, and at the same time so incriminating as to a federal prosecution, the likes of which the derivative use taint is so severe that an Indictment should be dismissed and a Prosecution Team removed. That juxtaposition makes no sense.

At this juncture, the Court should only adopt the first recommended procedure and require Wannemacher (and Zahn if he so joins) to file the *Garrity* statement *in camera*. This provides the Court an opportunity to review the statement(s) and continues to shield the compelled statement(s) from Government view. This starting point provides the Court the opportunity to glean whether the Government could have made any derivative use of the statements had the Prosecution Team reviewed them. The Court can consider additional protocols once Wannemacher files the motions he previews in the instant motion.

Respectfully submitted


ROGER B. HANDBERG
United States Attorney

*/s/ Tysen Duva*
Tysen Duva
Assistant United States Attorney
Florida Bar No. 0603511
300 N. Hogan Street, Suite 700
Jacksonville, Florida 32202
Telephone: (904) 301-6300
Facsimile:    (904) 301-6310
E-mail: Tysen.Duva@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2022, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a

notice of electronic filing to the following:

Counsel of Record

*s/ Tysen Duva*
Tysen Duva
Assistant United States Attorney

18