UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                                                    CASE NO. 3:22-cr-23-BJD-MCR

AARON ZAHN and
RYAN WANNEMACHER,

       Defendants.

_____/

## ORDER

**THIS CAUSE** is before the Court on Non-Party Nelson Mullins Riley & Scarborough LLP's Motion to Quash in Part Defendant Ryan Wannemacher's Subpoena *Duces Tecum* or, in the Alternative, Motion for a Protective Order ("Motion") (Doc. 99), Defendants' Response in Opposition thereto ("Defendants' Response") (Doc. 129), and the United States' Response to the Motion ("Government's Response") (Doc. 130).   For the reasons stated herein, the Motion is due to be **GRANTED**.

## I.    Introduction

Defendants, Aaron Zahn and Ryan Wannemacher, were indicted for allegedly participating in a scheme to defraud Jacksonville Electric Authority ("JEA") and the City of Jacksonville (the "City" or "COJ"), by creating a Performance Unit Plan ("PUP"), which would have illegally paid hundreds of

millions of dollars to JEA executives in the event of a sale of JEA's assets and liabilities.   (Doc. 1 at ¶ 15.)   The Indictment alleges that Mr. Zahn and Mr. Wannemacher knew the true purpose of the PUP was to enrich themselves at the expense of JEA and the City, but failed to disclose, and affirmatively misrepresented, material facts to JEA and the City in furtherance of their scheme.   (*Id.* at ¶ 19.)

On August 5, 2022, Defendants filed their Unopposed Third Motion for Leave to Serve Pretrial Subpoenas on Smith Hulsey & Busey ("Smith Hulsey") and Nelson Mullins Riley & Scarborough LLP ("Nelson Mullins"). (Doc. 70.)   The subpoena directed to Nelson Mullins sought production of a schedule of documents, records, communications, or other items related to Nelson Mullins's role in the investigation of the Special Investigatory Committee ("SIC") on JEA matters, including: (1) Nelson Mullins's policies regarding the collection, recording, or disclosure of *Garrity* statements; (2) communications between Nelson Mullins's attorneys or employees and the Government's "Prosecution Team"; and (3) communications by Daniel B. Nunn, Jr. and Lee D. Wedekind, III, which repeat, paraphrase, or summarize Mr. Wannemacher's *Garrity* statement.   (Doc. 99 at 2-3; Doc. 70-2 at 2-4.)

On August 11, 2022, the Court entered an Order granting Defendants' motion and stating in relevant part:

[T]he documents sought through the subpoenas are relevant to

2

the defense; do not seem to raise admissibility concerns, which in any event could be addressed on a case-by-case basis; are narrowly tailored to require production of relevant materials from pertinent time periods; production of the documents and files are necessary in advance of trial and failure to obtain them may unreasonably delay the trial; and the request is made in good faith.

(Doc. 73 at 2.)

After several conferrals regarding the scope of the subpoena, on October 6, 2022, Nelson Mullins produced 17 pages of documents. (*See* Doc. 99 at 3.) Later, Nelson Mullins produced a privilege log identifying four documents withheld on the basis of the work product privilege: a legal memorandum, dated January 11, 2021, which was prepared by Nelson Mullins in connection with JEA's pending civil litigation against Mr. Zahn and was provided to the prosecutor in this criminal action; and three related emails between a Nelson Mullins attorney and the prosecutor in this criminal case. (*Id.*) The four documents identified in the privilege log[1] are the basis for the present Motion, which seeks to partially quash the subpoena or, alternatively, to obtain a protective order with respect to these documents pursuant to Rules 16(d)(1) and 17(c) of the Federal Rules of Criminal Procedure.

---

[1] Pursuant to the Court's November 30, 2022 Order (Doc. 134), a revised privilege log and the four documents at issue in the present Motion were hand-delivered to the undersigned's chambers for an *in camera* review.

3

## II.    The Arguments

Nelson Mullins argues that the four documents are not discoverable because: (1) they are outside the scope of the subpoena; but even assuming that they were not outside the scope, the documents (2) are not related to or derived from any *Garrity* statements, and (3) are absolutely protected from disclosure by the work product doctrine.   (Doc. 99 at 3-4.)   As Nelson Mullins explains, the legal memorandum is absolutely privileged as opinion work product because it was prepared in preparation for trial and contains attorneys' mental impressions, conclusions, opinions, and theories concerning the civil litigation.   (*Id.* at 7-8.)   Nelson Mullins further explains:

> The memorandum at issue here contains legal analysis of issues prepared by JEA's outside counsel for JEA's use in pending proceedings adverse to Mr. Zahn.   Mr. Wannemacher does not challenge this point; rather, the position expressed by Mr. Wannemacher's counsel during the parties' conferrals is that the privilege has been waived by the memorandum's disclosure to the government.   . . .   But where the government and a disclosing party share a common interest in pending litigation, the exchange of information between them does not result in a privilege waiver.   . . .
> The government and JEA are not (nor have ever been) adverse parties, as JEA was not and is not a target or subject of the government's investigation, indictment, and prosecution. The disclosure was made to cooperate with the government without any self-interested ulterior motive.

(*Id.* at 9-10.)

Nelson Mullins adds that even if the subject documents were not privileged, they still should not be produced because they are not relevant to

any issue in this case.   (*Id.* at 1.)   Nelson Mullins explains that the withheld

documents have no perceivable relationship to the fraudulent scheme

charged in the Indictment.   (*Id.* at 5-6.)

Defendants respond that "[t]he circumstances of Nelson Mullins'[s]

communications with the prosecutor show that the [w]ithheld [d]ocuments

are likely to be relevant to critical constitutional issues in this criminal case,"

and "Nelson Mullins has waived any claim of work product regarding the

documents by producing them to the government."   (Doc. 129 at 1.)

Defendants explain:

> The Defendants' subpoena relates to one of the critical pretrial
> issues in this case: the treatment of compelled testimony by Mr.
> Zahn and Mr. Wannemacher that is protected under *Garrity v.*
> *New Jersey*, 385 U.S. 493 (1967).   Under the Supreme Court's
> *Garrity* opinion, where a public employee has provided compelled
> testimony, the government may not in a subsequent prosecution
> use the employee's "immunized testimony itself or any evidence
> that was tainted – substantively derived, shaped, altered, or
> affected, by exposure to the immunized testimony." *United States*
> *v. Slough*, 641 F.3d 544, 549 (D.C. Cir. 2011). "Nor can the
> government use it to develop investigatory leads, to focus an
> investigation on a witness, or to motivate another witness to give
> incriminating testimony." *Id.* (internal citations omitted).
>
> Both Mr. Zahn and Mr. Wannemacher were required to provide
> compelled testimony in this case. Although the federal prosecutor
> has represented that he and the other members of the
> prosecution team did not review the Defendants' *Garrity*
> testimony, multiple other teams of investigators made use of the
> compelled testimony in investigating the same events that
> resulted in the indictment of the Defendants, then discussed the
> results of their efforts with the prosecution team.

. . .   The communications between Nelson Mullins and the prosecution team are significant to the Defendants' *Kastigar* motions because Nelson Mullins attorneys reviewed the Defendants' compelled testimony shortly after it was given, then became involved in the investigation into their conduct.   *See* Doc. 114 at 120. The Defendants' compelled testimony was given in December 2019 and January 2020. In February 2020, the City Council convened a "Special Investigatory Committee on JEA Matters" ("SIC"), which was charged with investigating the PUP, the ITN, and the pursuit of potential privatization of JEA. Nelson Mullins applied to serve as counsel to the SIC. Although Nelson Mullins was not selected as SIC counsel, Nelson Mullins provided the SIC with a Memorandum regarding the "due diligence" investigation the firm conducted in connection with its application, and Nelson Mullins attorneys provided extensive testimony at the first SIC hearing, on February 24, 2020.   . . .

Nelson Mullins was then retained to represent JEA in subsequent employment litigation with Mr. Zahn. JEA filed suit against Mr. Zahn relating to the PUP, charging fraud and seeking to invalidate Mr. Zahn's employment agreement with JEA and prevent him from obtaining severance compensation. *See* Ex. 3. Nelson Mullins also represented JEA in proceedings relating to the termination of numerous JEA senior leadership team members. The SIC instructed its counsel, Smith Hulsey & Busey, and Nelson Mullins to coordinate their efforts. Doc. 114 A36:34-36. Nelson Mullins attorneys worked closely with the SIC's counsel, including sharing documents and information back and forth and participating jointly in each other's witness interviews.   . . .

Throughout Nelson Mullins' investigation into the Defendants, Nelson Mullins attorneys felt free to use the Defendants' compelled testimony. Likewise, the SIC, the SIC's counsel, and members of the City of Jacksonville's Office of General Counsel ("OGC") and Council Auditor's Office ("CAO") who were also investigating these matters all had access to the Defendants' *Garrity*-protected testimony and freely used it in their investigative efforts, including in questioning witnesses and discovering investigative leads.

Having had unrestricted access to the Defendants' *Garrity*-protected testimony, having collaborated with the other teams of investigators who also felt free to use the Defendants' compelled testimony, and having an interest in seeing a criminal prosecution initiated, Nelson Mullins attorneys shared the results of their work with the prosecutor. In response to the Rule 17(c) subpoena to Nelson Mullins, the firm produced the emails attached to this response as Exhibit 1. These emails reflect that prior to the return of the Indictment, Nelson Mullins attorney Lee Wedekind and the prosecutor had telephone conversations in July 2020 and an in-person meeting in December 2020. Ex. 1 at 1-14. After the Indictment was returned on March 2, 2022, the prosecutor contacted Mr. Wedekind to set up another call, stating that he wished to "schedule a call to get better acquainted with the related civil litigation that JEA is involved with." *Id.* at 15-17.

(Doc. 129 at 2-5 (footnotes omitted).)

Defendants explain that communications between Nelson Mullins and the prosecutor in this action are relevant to the anticipated *Kastigar* hearings.   (*Id.* at 7-8.)   Further, "JEA's [civil] litigation against Mr. Zahn is largely based on the same events and conduct as are described in the Indictment [here] and asserts many of the same theories."   (*Id.* at 8.)

In addition, Defendants argue that Nelson Mullins has not demonstrated that the withheld documents are protected by the work product privilege:

At the very least, the emails between Nelson Mullins and the prosecutor were not prepared in anticipation of litigation by JEA and cannot be deemed work product. Nelson Mullins does not have an attorney-client relationship with the government, and according to Nelson Mullins, they were transmittal emails, not communications made in preparation for litigation. Likewise, if the Memorandum was not prepared in anticipation of litigation,

but instead was prepared specifically for the purpose of being
produced to the government, it would not qualify for work
product protection.

(*Id.* at 9.)

In any event, Defendants argue, the Court need not determine whether

the documents are privileged, because any privilege has been waived by

voluntarily providing the documents to the Government outside the grand

jury proceedings and without any guarantees that the documents would be

kept confidential.[2]   (*Id.* at 10-11.)   Defendants add that "Nelson Mullins

made this disclosure on behalf of JEA to accomplish JEA's own purposes –

seeking the prosecution of Mr. Zahn."   (*Id.* at 11.)   Defendants explain that

Nelson Mullins's client, JEA, has an interest in seeing Mr. Zahn prosecuted

in order to further its interests in its own litigation with him.   (*Id.* at 12.)

Further, Defendants assert that Nelson Mullins has not met its burden

to establish that the common interest exception to the work product waiver

doctrine applies here.   (*Id.*)   They point out that Nelson Mullins, as the

party asserting this exception, was required to provide the Court with

evidence of its existence, which may be established by an affidavit.   (*Id.* at

---

[2] Defendants conceded that it might be appropriate for the Court to review
the documents *in camera* in order to determine whether they are privileged.   (Doc.
129 at 10.)   Nelson Mullins and the Government also did not object to an *in camera*
review of the documents by the Court.   (*See* Doc. 129 at 10 n.4; Doc. 130 at 4.)   As
such, the Court received the four documents and reviewed them *in camera*.

12-13.)   According to Defendants:

> There was no common legal enterprise here. The government is not a co-party with Nelson Mullins or its client, JEA. And as explained above, the fact that a successful prosecution of Mr. Zahn might promote JEA's interests in its civil litigation against him is not sufficient to establish a common interest or provide a basis for deeming the [w]ithheld [d]ocuments protected. Further, Nelson Mullins has not demonstrated that it took affirmative, demonstrable steps to protect the confidentiality of the [w]ithheld [d]ocuments, nor that there was an express common interest agreement between them and the government.

(*Id.* at 13.)

Even if Nelson Mullins had not waived the work product privilege,

Defendants argue the documents should still be produced because of

Defendants' Fifth Amendment due process rights in this criminal action.

(*Id.* at 14.)   Defendants state:

> Mr. Zahn and Mr. Wannemacher were required to provide compelled testimony that under *Garrity* and *Kastigar* may not be used against them in this criminal proceeding.   Nelson Mullins reviewed and used that testimony to investigate them, then discussed the fruits of its investigation with the prosecutor.   It should not be allowed to shield those communications from scrutiny by deeming them work product.

> Relatedly, the [w]ithheld [d]ocuments are also subject to production because the prosecutor's mental state, and specifically, what information he and the members of the prosecution team have been made aware of, are critical issues in this case.   Where the mental state of the prosecutor who received work product materials is in issue, the court may find there is a compelling need for the production of work product.

(*Id.* at 14-15.)

In its Response, the Government sides with Nelson Mullins and states that Defendants "are engaging in a fishing expedition in connection with [their] *Kastigar* Motions (Docs. 114 and 115) based on their *Garrity* interviews, which is impermissible under Rule 17(c)" of the Federal Rules of Criminal Procedure.   (Doc. 130 at 1-2.)   The Government asserts that the "Nelson Mullins firm had no role in the SIC investigation," the January 21, 2021 memorandum does not pertain to the *Garrity* interviews of Defendants, and is not relevant to an analysis of the LTI PUP, which is the centerpiece of the criminal prosecution."   (*Id.* at 2.)   The Government adds:

> Further, of particular relevance is the defendants' continued push that Nelson Mullins, a private law firm representing JEA in a civil lawsuit against Aaron Zahn concerning his termination for cause, has somehow tainted the Indictment against Zahn and Wannemacher simply because of the existence of the defendants' *Garrity* statements.   The undersigned and lawyers for Nelson Mullins have never discussed the defendants' *Garrity* statements.[3]

> While it is true that Nelson Mullins provided the January 11, 2021 Memorandum to the Government in January 2021 (at the undersigned's request), that was pursuant to the one way flow of information during a grand jury investigation (from civil lawyers to the Prosecution Team).   The January 11, 2021 Memorandum at issue does not pertain (in any way) to the defendants' *Garrity* statements (nor did it provide the Government any investigative leads arising from those statements), or analyze the LTI PUP in any substantive measure.

---

[3] . . .   In short, actions of civil lawyers (including writing internal memoranda) have no bearing on whether there was government action (derivative use) concerning a *Garrity* statement that implicated a defendant's Fifth Amendment rights.

> The January 11, 2021 Memorandum (while it pertains to the ITN) addresses theories pertinent to the civil litigation, which are not material to the allegations in the Indictment. The Government did not share the Memorandum with the grand jury.

(*Id.* at 2-3.)

### III.   Standard

Rule 17(c) of the Federal Rules of Criminal Procedure sets forth the procedure for producing documents and objects:

> **(1)  In General.**   A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates.   The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence.   When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.
>
> **(2)  Quashing or Modifying the Subpoena.**   On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive.

Fed.R.Crim.P. 17(c) (emphasis in original).

Rule 17(c) is "not intended to provide a means of discovery for criminal cases," but was meant "to expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials."   *United States v. Nixon*, 418 U.S. 683, 698-99 (1974); *see also United States v. Noriega*, 764 F. Supp. 1480, 1492 (S.D. Fla. 1991) (stating that Rule 17(c), Fed.R.Crim.P., "is not a discovery device").   "The Rule 'is designed as an aid for obtaining relevant evidentiary material that the moving party may use at trial,'" *United States v. Libby*, 432 F. Supp. 2d 26, 30 (D.D.C. 2006) (citation

omitted), "or in some other court proceeding," *Noriega*, 764 F. Supp. at 1492. "Thus, 'Rule 17(c) can be contrasted with the civil rules which permit the issuance of subpoenas to seek production of documents or other materials which, although not themselves admissible, could lead to admissible evidence.'" *Libby*, 432 F. Supp. 2d at 30 (citation omitted) (also stating that in the criminal context, "naked exculpatory material held by third parties that does not rise to the dignity of admissible evidence simply is not within the rule").[4]

Before the Supreme Court's decision in *Nixon*, most courts required a party seeking production of documents under Rule 17(c) to show that:

> (1) the documents requested are evidentiary and relevant;
> (2) the documents are not otherwise procurable reasonably in advance of trial by exercise of due diligence;
> (3) the requesting party cannot properly prepare for trial without production and inspection of the documents in advance of trial and failure to obtain the documents may tend unreasonably to delay the trial; and
> (4) the application is made in good faith and is not intended as a general "fishing expedition."

*United States v. Gow*, No. 2:17-cr-16-FtM-29CM, 2018 WL 6618654, *4 (M.D. Fla. Dec. 18, 2018) (citing *Nixon*, 418 U.S. at 699-700); *see also Libby*, 432 F.

---

[4] "The Supreme Court has enunciated a slightly different analysis for subpoenas *duces tecum* issued in connection with grand jury proceedings." *Libby*, 432 F. Supp. 2d at 30 n.6 (citing *United States v. R. Enters., Inc.*, 498 U.S. 292, 297-304 (1991)). "Although the Supreme Court has recently rejected strict requirements of relevancy, specificity, and admissibility for subpoenas *duces tecum* issued in connection with grand jury investigations, these standards remain applicable to trial subpoenas[.]" *Noriega*, 764 F. Supp. at 1492 n.11.

Supp. 2d at 30-31.

"Guided by these factors, the Supreme Court in *Nixon* concluded that to compel production of documents under Rule 17(c), the party seeking production 'must clear three hurdles: (1) relevancy; (2) admissibility; and (3) specificity.'" *Libby*, 432 F. Supp. 2d at 31 (citing *Nixon*, 418 U.S. at 700). "A subpoena that fails to satisfy these three requirements will be deemed unreasonable or oppressive and must be either quashed or modified." *Libby*, 432 F. Supp. 2d at 31.

> The first prong of this test—relevance—requires the Court to assess whether the documents sought have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. If the documents are deemed relevant, the Court must then determine whether they would be admissible. This inquiry is largely governed by the Federal Rules of Evidence. *See, e.g.,* Fed.R.Evid. 401–415, 801–807. Under these Rules, documents sought pursuant to a Rule 17(c) subpoena can be deemed admissible for a variety of purposes, including impeachment. . . . Admittedly, it will often be difficult at the pretrial stage to determine with precision the admissibility of certain documents; therefore, if a document is arguably relevant and admissible under the Rules of Evidence, the *Nixon* "evidentiary" requirement is likely satisfied.

> In addition to seeking documents that are both relevant and admissible, a Rule 17(c) subpoena must also be specific. Although the Supreme Court in *Nixon* requires that a party issuing a Rule 17(c) subpoena identify with specificity the documents being sought, the Court recognized that in some instances it may be impossible to "describe fully" the documents; therefore, the Court concluded that the specificity requirement could be satisfied if there is a "sufficient likelihood," demonstrated through rational inferences, that the documents being sought contain relevant and

admissible evidence. *Nixon,* 418 U.S. at 700, 94 S. Ct. 3090. While "exquisite specificity" is not required, *United States v. Poindexter,* 727 F. Supp. 1501, 1510 (D.D.C.1989), courts will not approve a subpoena for documents based upon requests for disclosure from broad categories of documents. *North,* 708 F. Supp. at 404. In fact, "[i]f the moving party cannot reasonably specify the information contained or believed to be contained in the documents sought but merely hopes that something useful will turn up, this is a sure sign that the subpoena is being misused." **\*32** *United States v. Noriega,* 764 F. Supp. 1480, 1493 (S.D. Fla.1991). The specificity requirement ensures that a Rule 17(c) subpoena will not be used as a "fishing expedition to see what may turn up." *United States v. King,* 164 F.R.D. 542, 545 (D. Kan.1996) (quoting *Noriega,* 764 F. Supp. at 1493) (internal quotation marks omitted). It is important to remember that "one of the major purposes of the specificity requirement is to provide the subpoenaed party or other party having standing with enough knowledge about what documents are being requested so as to lodge any objections on relevancy or admissibility."   . . .

*Libby*, 432 F. Supp. 2d at 31-32; *see also United States v. Arditti*, 955 F.2d 331, 345 (5th Cir. 1992) (stating that the "specificity and relevance elements require more than the title of a document and conjecture as to its contents.").

Protective orders regulating discovery are subject to Rule 16(d)(1) of the Federal Rules of Criminal Procedure:

At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief.   The court may permit a party to show good cause by a written statement that the court will inspect *ex parte*.   If relief is granted, the court must preserve the entire text of the party's statement under seal.

Fed.R.Crim.P. 16(d)(1).

Claims of work product immunity are governed by Rule 26(b)(3) of the

Federal Rules of Civil Procedure,[5] which states in pertinent part:

(A)   *Documents and Tangible Things.*   Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).   But, subject to Rule 26(b)(4), those materials may be discovered if:
(i)      they are otherwise discoverable under Rule 26(b)(1); and
(ii)      the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

(B)   *Protection Against Disclosure.*   If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

Fed.R.Civ.P. 26(b)(3).

Work product is divided into two general categories: "qualified" work product, which protects an attorney's factual investigations, and "absolute" or "opinion" work product, which protects an attorney's mental impressions. *Doubleday v. Ruh*, 149 F.R.D. 601, 607 (E.D. Cal. 1993).   A party seeking "qualified" work product must show a "substantial need" for the materials in

---

[5] As stated by the Eleventh Circuit in *Williamson v. Moore*, 221 F.3d 1177, 1182 & n.5 (11th Cir. 2000), the underlying policies regarding the work product doctrine as articulated by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495 (1947), which was a civil action, "are inherent in any kind of judicial proceeding." As such, this Court will rely on both civil and criminal cases analyzing the work product doctrine to the extent such cases are not inconsistent with the Federal Rules of Criminal Procedure.

the preparation of the party's case and an inability to obtain the information from other sources without undue hardship.   *Cozort v. State Farm Mut. Auto. Ins. Co.*, 233 F.R.D. 674, 676 (M.D. Fla. 2005) (citing *Hickman*, 329 U.S. 495); *Doubleday*, 149 F.R.D. at 607 (citing *Upjohn Co. v. United States*, 449 U.S. 383, 400 (1981)).

"Opinion work product," on the other hand, "encompasses all material that reflects an attorney's mental impressions, conclusions, opinions, or legal theories."   *Williamson*, 221 F.3d at 1182 (citing *Hickman*, 329 U.S. 495). "While opinion work product enjoys almost absolute immunity, extraordinary circumstances may exist that justify a departure from this protection." *Williamson*, 221 F.3d at 1182; *Cozort*, 233 F.R.D. at 676 ("While opinion work product is generally entitled to a higher degree of protection, such protection is not absolute and disclosure may be compelled in rare circumstances."). Opinion or "absolute work product is discoverable where an attorney's mental impressions are at issue and there is a compelling need for the material." *Doubleday*, 149 F.R.D. at 608 (citing *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992)); *see also Cozort*, 233 F.R.D. at 676 (stating that federal courts have found the existence of extraordinary circumstances for discovery of opinion work product "where the information sought is directly at issue and the need for its production is compelling").

The work product protections of Rule 26(b)(3), typically apply "only to

documents prepared principally or exclusively to assist in anticipated or ongoing litigation." *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 471 (S.D.N.Y. 1993) (internal citations omitted).   "[I]n order for the work product doctrine to apply, the party asserting the doctrine must demonstrate that at the time the materials were created or drafted, the entity must have anticipated litigation." *Schulte v. NCL (Bahamas) Ltd.*, No. 10-23265-CIV, 2011 WL 256542, *2 (S.D. Fla. Jan. 25, 2011) (citing *CSK Transp., Inc. v. Admiral Ins. Co.*, No. 93-132-CIV-J-10, 1995 WL 855421, *2 (M.D. Fla. July 20, 1995)).[6]   "Thus, materials or documents drafted or created in the ordinary course of business are not protected." *Id.*

"The Court must thus determine when the contested documents were created, and why the documents were created in assessing the applicability of the work product doctrine." *Spirit Master Funding, LLC v. Pike Nurseries Acquisition, LLC*, 287 F.R.D. 680, 685 (N.D. Ga. 2012).   "[I]t is now well recognized that documents that serve a dual purpose are covered by the work product protection if they were produced 'with the 'motivating purpose' for or 'because of' anticipated litigation.'" *Id.*   Also, "ordinarily, the work product doctrine does not shield from discovery documents created by third-parties."

---

[6] The "anticipation of litigation" inquiry is both subjective and objective.   *In re: Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998) (stating "the lawyer must at least have had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable").

*Hunter's Ridge Golf Co. v. Georgia-Pacific Corp.*, 233 F.R.D. 678, 681 (M.D. Fla. 2006).

"The work product privilege 'must be specifically raised and demonstrated rather than asserted in a blanket fashion.'" *Spirit Master*, 287 F.R.D. at 684 (internal citations omitted). "This burden may be satisfied through a detailed privilege log and affidavits from counsel, the party, or the expert, and also by any of the traditional ways in which proof is produced in pretrial proceedings." *Id.* "A privilege log's description of each document and its contents must provide sufficient information to permit courts and the parties to test the merits of the privilege claim." *Elite Mitigation Servs., LLC v. Westchester Surplus Lines Ins. Co.*, Case No. 5:19-cv-381-TKW/MJF, 2020 WL 6126886, *6 (N.D. Fla. Apr. 16, 2020); *see also Carnes v. Crete Carrier Corp.*, 244 F.R.D. 694, 698 (N.D. Ga. 2007) (stating the "burden is met when the party produces a detailed privilege log stating the basis of the claimed privilege for each document in question, together with an accompanying explanatory affidavit from counsel"). "Once [the party who asserts the claim of privilege] has shown the application of the work product privilege, the burden shifts to [the other side] to demonstrate the existence of exceptional circumstances for the discovery of otherwise privileged documents." *Spirit Master*, 287 F.R.D. at 684.

"The work product privilege provides only a qualified immunity from

discovery." *Atlantic Recording Corp. v. Spinrilla, LLC*, No. 1:17-cv-00431-AT, 2018 WL 6362660, *21 (N.D. Ga. Sept. 28, 2018). "It protects only documents and tangible things. It does not protect facts learned from the documents or things." *Id.* (citations omitted). Although mere facts "are not protected by the work-product doctrine," when "the facts are so intertwined with the mental impressions of the attorney or other work product protected materials, other methods exist for obtaining the factual information without disturbing the work-product protection," such as through depositions and interrogatories. *Spirit Master*, 287 F.R.D. at 687. "As work product is a 'qualified privilege,' it can thus be waived 'when the covered materials are used in a manner that is inconsistent with the protection.'" *Spinrilla*, 2018 WL 6362660 at *21 (citations omitted). "Generally speaking, . . . work-product protection is waived when protected materials are 'disclosed in a manner which is either inconsistent with maintaining secrecy against **opponents** or substantially increases the opportunity for a potential **adversary** to obtain the protected information.'" *Brown v. NCL (Bahamas), Ltd.*, 155 F. Supp. 3d 1335, 1339 (S.D. Fla. 2015) (emphasis in original) (internal citations omitted).

"In the context of work product, the question is not, as in the case of the attorney-client privilege, *whether* confidential communications are disclosed, but *to whom* the disclosure is made—because the protection is designed to

protect an attorney's mental processes from discovery by *adverse* parties."

*Id.* at 1338-39.   As explained in *Brown*:

> Work-product protection is waived when protected materials are
> disclosed in a way that "substantially increases the opportunity
> for potential **adversaries** to obtain the information."  . . .   "The
> purpose of the work product doctrine is to protect information
> against **opposing parties**, rather than against all others outside
> a particular confidential relationship, in order to encourage
> effective trial preparation[.]   A disclosure made in the pursuit of
> such trial preparation, and not inconsistent with maintaining
> secrecy against **opponents,** should be allowed without waiver of
> the privilege.   Thus, not *every* situation in which work-product
> materials are disclosed warrants a finding of waiver.   Rather,
> the "*circumstances* surrounding the disclosure are key to
> determining whether an actual waiver of the work-product
> protection has occurred."

*Id.* at 1339 (emphasis in original) (internal citations omitted).

There are "three categories of waiver of work product protection when

items are produced to governmental entities":

> The first category occurs where work product is produced to a
> governmental entity that is an ally in litigation or has a common
> interest with the producing party.   This production does not
> result in waiver.   The second category occurs where there is
> disclosure to a governmental entity in response to some coercion
> by the governmental authority, which is not expected to reveal
> the material to the producing party's adversary.   This production
> does not typically result in a waiver.   The third category occurs
> where the producing party voluntarily produces material to a
> governmental agency to incite an attack on the producing party's
> adversary.   This category of production waives the work-product
> protection.

*Absolute Activist Value Master Fund Ltd. v. Devine*, No. 2:15-cv-328-FtM-

29MRM, 2017 WL 1830569, *2 (M.D. Fla. May 8, 2017) (internal citations

omitted); *see also Brown*, 155 F. Supp. 3d at 1339 (stating that many cases "hold that *compelled* disclosure to a government agency does not necessarily waive work-product protection"; also, "when disclosure of privileged material to the government agency is not in an adversary context, courts often recognize that the policy reasons for a waiver do not exist, and they conclude that no waiver was created") (emphasis in original); *Shulton Inc. v. Optel Corp.,* No. 85–2925, 1987 WL 19491, *5 (D.N.J. 1987) (finding a corporation did not waive work-product protection when it cooperated with the government to secure an indictment for a mutual adversary); *United States v. Am. Tel. & Tel.*, 642 F.2d 1285, 1299 (D.C. Cir. 1985) (stating that waiver did not occur in the context of disclosure to an adversary party when a party submitted work-product material to assist the government in investigating or prosecuting another).

"When there are common interests between the transferor and the transferee against a common adversary, . . . 'the transferee is not at all likely to disclose the work product material to the adversary.'" *Devine*, 2017 WL 1830569 at *4 (citing *Am. Tel. &Tel.*, 642 F.2d at 1299) ("Here, not only did plaintiffs and the Swiss Prosecutor have common interests against a common adversary, the plaintiffs also requested, at least in two letters, to the extent permitted by law, that the Swiss Prosecutor refrain from communicating certain information to defendant."). However, "*voluntary* disclosure to a

21

government agency 'to effect a goal by the disclosing party other than assistance in prospective or ongoing litigation . . . generally constitutes waiver.'"  *Brown*, 155 F. Supp. 3d at 1340 (emphasis in original); *U.S. Info. Sys. Inc. v. Int'l Bd. Of Elec. Workers Local Union No. 3*, 00 Civ. 4763, 2002 U.S. Dist. LEXIS 19363, at *13 (S.D.N.Y. 2002) (stating that disclosure to a prosecutor in an effort to take law enforcement action against a party and thereby gain an advantage in later civil litigation against that party produces a waiver because "the party asserting the work product and the government agency are not allies"); *In re: Grand Jury Proceedings*, M–11–188 (LAP), 2001 U.S. Dist. LEXIS 2425, at *61–62 (S.D.N.Y. 2001) (finding waiver of work-product protection when a corporation submitted a report to the prosecutor in an attempt to avoid prosecution).   Finally, "the voluntary disclosure of attorney work product to an adversary *or a conduit* to an adversary waives work-product protection for that material."   *Devine*, 2017 WL 1830569 at *5 (emphasis in original).

## IV.   Analysis

Here, upon review of the subject documents *in camera* and consideration of the relevant law, the undersigned finds that the legal memorandum, dated January 11, 2021, and related emails, dated January 11, 2021 and January 12, 2021, are protected from disclosure under the work product privilege.   The legal memorandum is absolutely privileged as

opinion work product prepared in connection with the development of JEA's litigation and trial strategies in the civil action against Mr. Zahn.[7]

Moreover, the work product privilege has not been waived by Nelson Mullins's voluntary disclosure of the memorandum to the prosecutor in this case for the purpose of cooperating with the Government.   (Doc. 99 at 9-10.) Notably, JEA and the Government are not adverse parties, JEA is not the target of an investigation, and the disclosure to the prosecutor did not substantially increase the opportunity for potential adversaries to obtain the information, particularly since Nelson Mullins requested, in a January 12, 2021 email to the prosecutor, that the information be considered confidential. Further, to the extent the Government and JEA had a common interest to secure an indictment for a mutual adversary, the disclosure of the memorandum did not result in a waiver of the work product privilege.   *See, e.g.*, *Devine*, 2017 WL 1830569, at *2 & *4; *Am. Tel. & Tel.*, 642 F.2d at 1299-1300.   In sum, JEA's counsel voluntarily produced the memorandum in response to the prosecutor's request pursuant to a one-way flow of information during a grand jury investigation, which did not waive the work

---

[7] The legal memorandum, dated January 11, 2021, was prepared by Mr. Nunn and Mr. Wedekind for Nelson Mullins's file, and reportedly was not shared with any other person or entity other than the federal prosecutor, whereas JEA's Complaint in the civil action against Mr. Zahn was filed in state court on June 5, 2020.

product privilege as to the withheld documents.   *See, e.g., Brown*, 155 F.

Supp. 3d at 1336 (finding that "NCL did <u>not</u> waive work-product protection

by giving a copy of a one-page, work-product document to port police upon

request")[8] (emphasis in original).

Defendants also argue that the prosecutor's mental state and,

specifically, what information he and the members of the prosecution team

have been made aware of, are critical issues in this case.   (Doc. 129 at 15.)

However, the cases on which Defendants rely are plainly distinguishable.

For example, in *Cozort*, the plaintiff sought discovery of his insurer State

Farm's claim, underwriting, and investigative files, correspondence, and

documents evidencing bad faith notices, to which State Farm responded with

---

[8] The district court in *Brown* explained:
There is nothing in the record to suggest that NCL was in
an **adversarial** relationship with the port police when it turned over a
copy of the statement for which it claims work-product protection.
Similarly, there is no evidence to suggest that NCL disclosed the
document in order to escape or limit criminal prosecution.   To the
contrary, all the evidence suggests that NCL turned over the document
in an effort to *cooperate* with law enforcement in an investigation of a
third party (i.e., the passenger who allegedly attacked the plaintiff).
Although there appears to have been no confidentiality promise made
by the port police, the fundamental factor here is that there was no
adversarial relationship.   . . .
Motivation for the disclosure and the specific circumstances underlying
the disclosure are critical in a case-by-case evaluation of potential
work-product waiver.   In the instant case, the port police were not
adversaries, and NCL's decision to turn over a document to assist law
enforcement without a self-centered motivation to enhance its own
potential exposure in the criminal investigation does not waive work-
product protection.
*Brown*, 155 F. Supp. 3d at 1341 (emphasis in original) (footnote omitted).

production of some documents and a voluminous privilege log citing work product and attorney client privilege.   *Cozort*, 233 F.R.D. at 675.   The district court in that case held that the mental impressions of State Farm's counsel were directly at issue and, thus, exceptional circumstances justified invading the opinion work product immunity pertaining to the documents created as part of the coverage litigation.   *Id.* at 677.   In *Doubleday*, the district court found that the deputy district attorneys' mental impressions about the case were at issue and that the plaintiff had demonstrated a compelling need for the prosecutorial file, including any information reflecting his mental impressions or thought processes.[9]   *Doubleday*, 149 F.R.D. at 608.   Importantly, the holding in *Doubleday* was expressly limited to the situation in that case.   *Id.* at 607 n.6 ("The court desires to make clear

---

[9]  The court explained:

> Here, plaintiff asserts that the main issue of her case is "the affect [sic] defendants had on the district attorneys' decision to prosecute. Plaintiff intends to prove at trial that the deputy district attorneys' evaluation of the criminal case against plaintiff was influenced by coercion and misinformation provided by defendants."  . . .  It is clear that the mental workings of the defendant officers are at issue, especially to the extent that the district attorneys' mental processes reflect those of the officers.   To the extent that the prosecutor's notes reveal unease, irritation, or the like with respect to the pressures, if any, brought to bear against them by the individual defendants, those notes constitute the heart of plaintiff's case.   A review of the inventory log indicates that the file contains notes of a prosecutor's conversations with the officers, and his thoughts of these conversations, as well as how they affected his handling of the case.

*Doubleday*, 149 F.R.D. at 608.

that its holding in this case is limited to the situation presented here—the prior case is criminal, and the subsequent case is civil.").   As the facts of these two cases illustrate, applying either *Cozort* or *Doubleday* to the present case would be a stretch to justify disclosure of the opinion work product prepared by Nelson Mullins.

In addition, to the extent Defendants argue that the information sought is directly at issue and the need for its production is compelling, the Court does not find that Defendants have presented extraordinary circumstances for disclosure of the withheld documents.   Defendants argue that the withheld documents "are likely to be relevant to" the treatment of Defendants' compelled testimony under *Garrity*.   (Doc. 129 at 1-2.) However, the Government has repeatedly represented that neither the prosecutor nor any other member of his team has reviewed Defendants' *Garrity* statements, and the prosecutor has never discussed Defendants' *Garrity* statements with Nelson Mullins attorneys.   (*See* Doc. 130 at 2-3; Doc. 132 at 1-2, 7-11, 16.)   Moreover, Nelson Mullins represents in the documents submitted to the Court that the legal memorandum at issue here does not pertain to Defendants' *Garrity* statements and does not include such statements.[10]   Also, the Government represents that the subject

---

[10] The undersigned has not reviewed the totality of Defendants' *Garrity* statements, which, contrary to the parties' representations, have *not* been

memorandum was not shared with the grand jury.   (*See* Doc. 130 at 2-3.)

Based on the foregoing, the Court finds that the four documents that are at issue in the present Motion are protected by the work product privilege and need not be produced pursuant to the subpoena.   Although the three emails described in the revised privilege log and included in the *in camera* submission are admittedly brief, they reference the title of the memorandum, which reveals privileged information.   Thus, the emails are also shielded from disclosure.

Accordingly, it is **ORDERED**:

The Motion (**Doc. 99**) is **GRANTED**.   Nelson Mullins need not produce the legal memorandum and related emails identified on the revised privilege log.

---

submitted separately to the Clerk of Court for filing under seal.   (*See* Doc. 132 at 3 ("The two *Garrity* statements have been filed under seal so that the Court can review them *in camera*."); Doc. 115 at 15 (stating that Defendant Zahn's *Garrity* statement was transcribed into two volumes totaling 478 pages.)   To the extent Defendants have incorporated portions of their *Garrity* statements into their unredacted motions for a *Kastigar* hearing, the undersigned has reviewed the same and has not found inconsistencies with Nelson Mullins's position that the January 11, 2021 legal memorandum does not pertain to Defendants' *Garrity* statements and does not include such statements.

**DONE AND ORDERED** at Jacksonville, Florida, on December 19, 2022.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record