UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                  Case No. 3:22-cr-00023-BJD-MCR

AARON ZAHN and
RYAN WANNEMACHER

      Defendants.

_____/

## DEFENDANTS' MOTION FOR ORDER TO SHOW CAUSE

The Defendants, Ryan Wannemacher and Aaron Zahn, respectfully request the Court enter an Order to Show Cause against non-party subpoena recipient Pillsbury Winthrop Shaw Pittman, LLP, that would initiate civil contempt proceedings. By way of background, this Court granted the Defendants leave to serve a pretrial subpoena on Pillsbury for "[t]he firm's file related to its representation of JEA … including all drafts, notes, and electronic communications and documents." Doc. 60; Ex. A. The Defendants promptly served the subpoena and spent six months attempting to confer with Pillsbury about the scope of its "rolling production" of documents and emails the firm obtained from NetDocuments and Outlook. But Pillsbury ultimately *refused* to produce all of the drafts, notes, and internal communications the subpoena demanded unless the Defendants ceded their right to know what efforts the firm was making to respond to the subpoena (and to challenge those efforts).

The Court should exercise its contempt powers to compel Pillsbury to do what the law requires—"make in good faith all reasonable efforts to comply with the subpoena." *United States v. Ryan*, 402 U.S. 530, 534 (1971); *see also United States v. Hayes*, 772 F.2d 723, 725 (11th Cir. 1984). For the reasons explained below, the Defendants respectfully request the Court grant their motion and issue an Order to Show Cause.

<strong>Background[1]</strong>

**A.      The Allegations in the Indictment**

On March 2, 2022, the grand jury returned a 28-page, two-count indictment against Mr. Zahn and Mr. Wannemacher related to their prior employment as Chief Executive Officer and Chief Financial Officer, respectively, of JEA. Doc. 1. The Indictment alleges a scheme occurring over nine months that involved a complex "invitation to negotiate" (ITN) process conducted by JEA and a multi-month strategic planning process that evaluated the identifiable contingencies impacting the industry as a whole and JEA specifically. This detailed analysis required input from numerous JEA personnel—including every JEA department head—and was led by expert consultants from a leading national consulting firm that examined JEA's 10-year future. The Indictment also focuses on the development of a long-term incentive plan for JEA that did not finish legal review by the Office of General Counsel and outside

---

[1] Undersigned counsel has exchanged about 50 emails and letters with Pillsbury about their response to the subpoena. Some of those are exhibits to this motion, and the total compilation can be submitted to the Court upon request.

national law firms.  The long-term incentive plan was never implemented.  The

Indictment also alleges a substantive wire fraud count in connection with the

July 23, 2019, JEA Board Meeting.  *Id.* at 26-27.

> **B.     Pillsbury's Involvement in Drafting the Proposed Long-Term Incentive Plan**

Pillsbury was one of the national law firms that JEA hired to consult on the ITN

and was one of the principal legal advisors in the development of the proposed long-

term incentive plan.  The government refers to Pillsbury in the Indictment as "Law

Firm C."  Doc. 1 at 5.  The government alleges that the Defendants calculated a

potential payout from the long-term incentive plan but did not share it with any

"lawyer involved in the ITN."  *Id.* at 10.

The evidence will show that Pillsbury attorney Jessica Lutrin drafted the

proposal for the long-term incentive plan that the Defendants presented to the JEA

Board for consideration after she had extensive communications with JEA's Senior

Leadership Team.  In fact, Lutrin prepared several draft documents related to the

long-term incentive plan leading up to the final proposal to the JEA Board.  The Senior

Leadership Team commented on those draft documents and the design of the plan.

As reflected in the government's "302" memorandum of interview, Lutrin explained

to the government that she heard a payout figure "internally" but that it was not

"definite" because "[a] more definitive figure would come from" any "actual accepted

bid amount."  In addition to Lutrin, the Defendants worked with Pillsbury attorneys

Stephen Amdur and Peter Hunt on the ITN and the potential long-term incentive plan during the time period alleged in the Indictment.

### C.    The Defendants Served a Rule 17(c) Subpoena on Pillsbury

Based on the government's allegations and Pillsbury's known involvement during the pertinent time period, the Defendants requested leave to serve a pretrial subpoena for the production of the firm's file. Doc. 59. The proposed subpoena sought production of "[t]he firm's file related to its representation of JEA … including all drafts, notes, and electronic communications and documents." Doc. 59-2. The Court granted the Defendants' motion on June 29, 2022, ruling that the subpoena to Pillsbury satisfied the three-factor test under *United States v. Nixon*, 418 U.S. 683, 698-99 (1974). Doc. 60.

Pillsbury's general counsel accepted service of the subpoena one week later. During a telephone conference on July 12 between Pillsbury and Mr. Wannemacher's counsel, Pillsbury explained that the firm used NetDocuments (NetDocs) as its cloud-based document management software and Microsoft Outlook as its email server. The parties agreed in early August that Pillsbury would use a search protocol to collect relevant emails from Outlook that were sent to or from attorneys Lutrin and Hunt. Ex. B. According to Pillsbury, a preliminary search of those Outlook custodian files yielded 61,000 responsive documents. *Id.* Pillsbury further represented to Mr. Wannemacher's counsel that the firm would produce its NetDocs file. *Id.*

Meanwhile, the Defendants did not shy away from the subpoena's demand for production of the firm's drafts, notes, and internal communications related to the

proposed long-term incentive plan.  Mr. Wannemacher's counsel discussed this request with Pillsbury during the July 12 telephone conference.  When Pillsbury challenged them, counsel explained that those items—the firm's drafts, notes, and internal communications related to the proposed long-term incentive plan—were *highly relevant* based on the government's allegations that the Defendants had lied to JEA's lawyers as part of the conspiracy.  Counsel and Pillsbury agreed to put aside their dispute over the drafts, notes, and internal communications to give Pillsbury time to suggest a proposal for a responsive production.  Pillsbury told Mr. Wannemacher's counsel in early August that the firm was "checking to see" if it would produce "internal emails solely related to the" proposed long-term incentive plan.  Ex. B at 5.

Pillsbury did not meaningfully communicate with the Defendants for the rest of August.  Pillsbury attributed this to "[c]ounsel for JEA," who the firm claimed was "coordinating with all of the law firms that received subpoenas."  This made little sense because Pillsbury represented to the government preindictment that JEA had waived any claim of attorney-client privilege.

Mr. Wannemacher's counsel sent a conferral email to Pillsbury on September 1 to ask when the Defendants would expect JEA's counsel's coordination would result in a production.  Ex. C.  Pillsbury responded the next day to inform the Defendants that Pillsbury would provide a "rolling production" that the firm "hope[d]" to transmit "sometime next week."  *Id.*

There was no production the following week.  Pillsbury made its first production on September 30.  This was the beginning of a concerning pattern of

communications.  Mr. Wannemacher's counsel asked about the status and scope of productions, and Pillsbury told them to wait patiently while the firm cobbled together its productions.  *See, e.g.,* Ex. D (compilation of emails from October and November 2022).

### D.    Pillsbury Refuses to Produce Highly Relevant Documents

On November 10, Mr. Wannemacher's counsel had a second conferral call with Pillsbury.  Pillsbury advised counsel that the firm intended to complete its transmittal by Thanksgiving and inform them at that time of any objections to the production of particular items.    Ex. E.    On November 21, Pillsbury wrote a letter to Mr. Wannemacher's counsel that offered to produce draft documents from the firm's NetDocs file, internal emails from NetDocs and Outlook, and Pillsbury's emails with another law firm (Foley & Lardner) about the long-term incentive plan if the Defendants dropped their request for attorney notes.  Ex. F at 1-2.  The very next day, the Defendants responded to reject that offer.  *Id.* at 3-4.  Mr. Wannemacher's counsel raised two concerns as part of their good-faith attempt to confer: (1) Pillsbury had not offered legal authority to support withholding the production of attorney notes; and (2) the firm should not withhold categories of documents (the drafts and internal emails) as leverage because there was no valid objection to their production.  *Id.*

Pillsbury and Mr. Wannemacher's counsel did confer on the merits of Pillsbury's claim that attorney notes and internal emails are work-product not subject to production.  Ex. F at 5-10.  But on December 13, Pillsbury informed counsel that the firm's NetDocs file did not have any documents that would objectively be

categorized as attorney notes. Ex. G. Pillsbury, however, maintained its position that it would not turn over drafts and internal emails unless the Defendants agreed not to pursue the production of attorney notes. *Id.* That there were no attorney notes stored in NetDocs raised the very concern of completeness that the Defendants tried to avoid five months earlier when they had their initial call with Pillsbury—that highly relevant documents typically making up a firm's "file" were not stored in NetDocs.

Mr. Wannemacher's counsel was left to ask Pillsbury two straightforward questions: (1) whether the attorneys handling the firm's production knew about responsive documents (drafts, notes, etc.) that were *not* stored in NetDocs; and (2) whether those attorneys ever asked the attorneys involved in the JEA matter if they had relevant documents not stored in NetDocs. Ex. H at 4-5. When Pillsbury resisted answering those questions, the Defendants requested that the firm make any final production of responsive items by the close of business on January 5. *Id.* at 2-4. In response, Pillsbury restated its position that it would *not* do a "broad-based search through [its] files for drafts, notes, or other relevant documents not stored in NetDocs." *Id.* at 1-2.

To be sure, Pillsbury has made five productions to the Defendants (on September 30, 2022; October 28, 2022; November 23, 2022; December 13, 2022; and January 13, 2023). Ex. I. But there is no dispute that Pillsbury has withheld production of internal emails and drafts the firm recovered from their review of the NetDocs and Outlook files, and the firm has told the Defendants they will not look for attorney notes when there were none in NetDocs.

## Legal Standard

"A subpoena has never been treated as an invitation to a game of hare and hounds, in which the witness must [comply] only if cornered at the end of the chase." *United States v. Bryan*, 339 U.S. 323, 331 (1950).  As noted, the recipient of a subpoena must "make in good faith all reasonable efforts to comply[.]"  *Ryan*, 402 U.S. at 534. When that does not happen, Federal Rule of Criminal Procedure 17(g) gives this Court[2] the express authority to hold a non-party in contempt for disobeying the subpoena without adequate excuse.  This is similar to the Court's inherent authority to enforce its own orders.  *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764-65 (1980).

It is settled law that the Court will first consider whether civil contempt is appropriate to coerce compliance rather than criminal contempt to impose punishment on the offender.  *Shillitani v. United States*, 384 U.S. 364, 371 n.9 (1966); *see also Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, No. 6:07-cv-222-Orl-98-KRS, 2008 WL 4371345, at *3 (M.D. Fla. Sept. 22, 2008) ("Civil contempt is a process used by a court to compel compliance with a subpoena or court order.").[3]  Civil contempt proceedings

---

[2] Rule 17(g) further states that "[a] magistrate judge may hold in contempt a witness who, without adequate excuse, disobeys a subpoena issued by that magistrate judge as provided in 28 U.S.C. §636(e)."  Judge Monte Richardson entered the order granting the Defendants leave to serve the Rule 17(c) subpoena on Pillsbury.  Doc. 60.

[3] The Court has "numerous options" for sanctions, including a coercive daily fine, a compensatory fine, and an award of attorney's fees and expenses.  *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1304 (11th Cir. 1991).  "When fashioning a sanction to secure compliance, a district court should consider 'the character and magnitude of the harm threatened by continued contumacy and the probable effectiveness of any suggested sanction in bringing about the result desired.'"  *Id.* (quoting *EEOC v. Guardian Pools, Inc.*, 828 F.2d 1507, 1515 (11th Cir. 1987)).

for failure to comply with a subpoena are warranted when the movant shows by clear and convincing evidence that (1) the subpoena was "valid and lawful," (2) the subpoena was "clear and unambiguous", and (3) the recipient "had the ability to comply with the order." *Ga. Power Co. v. N.L.R.B.*, 484 F.3d 1288, 1291 (11th Cir. 2007).[4]

Once that showing is made, the Court should enter a show cause order requiring the non-party to explain why it should not be held in contempt and then conduct a hearing on that question. *Mercer v. Mitchell*, 908 F.2d 763, 768 (11th Cir. 1990). The non-party must prove that the failure to comply with the subpoena was due to an inability despite making all reasonable efforts. *In re Chase & Sanborn Corp.*, 872 F.2d 397, 400 (11th Cir. 1989). The fact that a non-party could have filed a motion to quash a subpoena is not an adequate excuse for noncompliance to avoid contempt. *Matter of Fula*, 672 F.2d 279, 284 (2d Cir. 1982); *see also* Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 280 (4th ed. 2022) ("A person charged with contempt for noncompliance with a subpoena cannot raise in a contempt proceeding defenses to the subpoena that she could reasonably have included in her prior motion to quash the subpoena.").

---

[4] Civil contempt proceedings typically arise from the failure to comply with a court order, but Rule 17(g) does not require an order to proceed with contempt proceedings. The Eleventh Circuit has explained that a subpoena is "an instrument of that court's process," bearing the court's seal and issued by the clerk. *Matter of Certain Complaints under Investigation by an Investigating Committee of the Judicial Council of the Eleventh Circuit*, 783 F.2d 1488, (11th Cir. 1986). As such, a non-party that fails to timely move to quash the subpoena may be held in contempt for disregarding it without an additional court order compelling compliance. *Id.*

## Argument

The Court should enter a show cause order for Pillsbury to explain why it should not be held in contempt because it has failed to make in good faith all reasonable efforts to produce the drafts, notes, and internal communications that the Defendants' Rule 17(c) subpoena demanded. All three requirements for the Court to initiate civil contempt proceedings are present: (1) the subpoena was validly issued; (2) the subpoena unambiguously called for the production of drafts, notes, and internal communications; and (3) Pillsbury had the ability to comply. *See Ga. Power Co.*, 484 F.3d at 1291.

The pretrial subpoena the Defendants served on Pillsbury was validly issued. The Court may issue a subpoena to a non-party to produce documents and other items before trial for inspection by the parties. Fed. R. Crim. P. 17(c). The Court granted the Defendants leave to serve a subpoena on Pillsbury after considering the test set forth in *Nixon*, 418 U.S. 699-700, and it directed the Clerk to issue the subpoena. Doc. 60; *see also United States v. Silverman*, 745 F.2d 1386, 1397 (11th Cir. 1984) (party may subpoena non-party under Rule 17(c) if "specifically identified documents … will be admissible at trial" and "the application for the subpoena is made in good faith"). As the Court explained, the documents sought in the subpoena were relevant to the defense, did not raise admissibility concerns, and were necessary in advance of trial so that there was no unreasonable delay. *Id.* at 2. The Court further noted that the subpoena was specific because it identified a specific client number, a time frame, and documents. *Id.* There is no question the Court exercised its broad discretion to grant

10

the Defendants leave to serve their subpoena.  *See United States v. Murray*, 297 F.2d 812, 821 (2d Cir. 1962) (leave to serve Rule 17(c) pretrial subpoena is within court's discretion).

The subpoena to Pillsbury was unambiguous.  It required production of "[t]he firm's file related to its representation of JEA … including all drafts, notes, and electronic communications and documents."  Ex. A.  There were no qualifications to this language, and Pillsbury has never claimed otherwise.  In fact, it should not surprise Pillsbury that the Defendants sought the firm's internal emails, draft documents not sent to the client, and attorney notes related to their representation of JEA.  The Defendants have pressed this point with Pillsbury since their initial telephone conference about the subpoena on July 12, 2022.

Finally, Pillsbury had the ability to comply with the subpoena.  Pillsbury has collected from NetDocs and Outlook a universe of internal emails and drafts it did not share with the client.  The problem is that Pillsbury is withholding production of those items as leverage to get the Defendants to drop their claim for Pillsbury to produce attorney notes that go to the heart of the Indictment—what the Defendants communicated to JEA's attorneys during the development of the proposed long-term incentive plan.

Pillsbury may claim that Defendants have made compliance impossible because there are no attorney notes in NetDocs.  That assertion would be flat wrong.  It is Pillsbury's duty to make all good-faith, reasonable efforts to comply with the scope of the subpoena.  *Ryan*, 402 U.S. at 534.  It was apparent to the Defendants when they

learned Pillsbury did not store attorney notes in NetDocs that the notes must be in another file. Yet Pillsbury has evaded questions about what efforts it has made to locate attorney notes other than turning to NetDocs and Outlook. This is particularly concerning because Pillsbury has not referred to a firm policy or guideline to support a contention that NetDocs is the only repository for client documents. If that were the case, the Outlook search protocol that Pillsbury formulated would have been redundant. But the firm has refused to tell the Defendants whether the Pillsbury attorneys working on this production know about relevant documents not stored in NetDocs or if those attorneys have asked the attorneys who worked on JEA, like Lutrin, if they stored their attorney notes outside of NetDocs. There is no basis for Pillsbury's "take what you can get" position.

Finally, any claim by Pillsbury that internal emails, draft documents not sent to the client, and attorney notes are work product should be equally unavailing. It is telling that Pillsbury did not move to quash or modify the subpoena on this basis. That motion would have failed.

As Mr. Wannemacher's counsel explained to Pillsbury, attorney notes in the abstract are not automatically barred from production as work product. They may be fact work product—discoverable for substantial need—because they summarize counsel's factual investigation. *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007); *see also United States v. Petit*, 438 F. Supp. 3d 212, 215 (S.D.N.Y. 2020) (defendants had substantial need for production of fact work product that included exculpatory information). If the notes are opinion work product—because

they contain the attorney's mental impressions or conclusions—the notes may be "discovered and admitted when mental impressions are at issue in a case and the need for the material is compelling." *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992). Here, it is evident that that the government will attempt to show a conspiracy to commit fraud by the Defendants based on what it will assert was a failure to make adequate disclosures to the JEA Board and the company's counsel during the development of the long-term incentive plan. The Defendants' constitutional right to investigate and present a defense will hinge on the discovery of mental impressions and legal conclusions. In any event, Pillsbury has refused to make all good-faith, reasonable efforts to locate relevant attorney notes to review what they say. The work-product protection cannot be applied in the abstract and is therefore not an adequate excuse for Pillsbury's noncompliance.

In sum, there is clear and convincing evidence that Pillsbury has willfully failed to comply with the Defendants' valid and unambiguous Rule 17(c) subpoena. The Court should issue a show cause order for Pillsbury to explain why it should not be held in civil contempt to compel compliance.

## Conclusion

For these reasons, the Defendants' motion for an Order to Show Cause against Pillsbury should be granted.

Respectfully submitted,


/s/ *James E. Felman*                      /s/ *A. Brian Albritton*

James E. Felman                             A. Brian Albritton
  Florida Bar No. 0775568           Florida Bar No. 0777773
Katherine Earle Yanes                       Raquel Ramirez Jefferson
  Florida Bar No. 0159727           Florida Bar No. 103758
Brandon K. Breslow                          PHELPS DUNBAR LLP
  Florida Bar No. 0123755         100 South Ashley Drive, Suite 2000
KYNES, MARKMAN                              Tampa, FL 33602
& FELMAN, P.A.                              Telephone: (813) 472-7557
Post Office Box 3396                        Facsimile: (813) 472-7570
Tampa, FL 33601                             brian.albritton@phelps.com
(813) 229-1118                              ramirezr@phelps.com
(813) 221-6750
JFelman@kmf-law.com                         Eddie Suarez
kyanes@kmf-law.com                            Florida Bar No. 752540
bbreslow@kmf-law.com                        THE SUAREZ LAW FIRM
                                            1011 West Cleveland Street
NIELS P. MURPHY                             Tampa, FL 33606
  Florida Bar No. 0065552         Telephone: (813) 229-0040
CATHERINE M. LICANDRO                       Facsimile: (813) 229-0041
  Florida Bar No. 0041668         esuarez@suarezlawfirm.com
MURPHY & ANDERSON, P.A.
1501 San Marco Blvd.                        *Counsel for Defendant Aaron Zahn*
Jacksonville, FL 32207
(904) 598-9282 (phone)
(904) 598-9283 (fax)
nmurphy@murphyandersonlaw.com
clicandro@murphyandersonlaw.com


*Counsel for Defendant Ryan Wannemacher*

14

**CERTIFICATE OF SERVICE**

I certify that on February 8, 2023, the foregoing motion was electronically filed

with the Clerk of the Court using the Electronic Filing System, which will serve a copy

on all counsel of record.

I further certify that on February 8, 2023, the foregoing motion was e-mailed to

non-party Pillsbury Winthrop Shaw Pittman LLP at:

Maria Galeno
Pillsbury Winthrop Shaw Pittman LLP
maria.galeno@pillsburylaw.com

Marcia Pope
Pillsbury Winthrop Shaw Pittman LLP
marcia.pope@pillsburylaw.com

Rachelle Rennagel
Pillsbury Winthrop Shaw Pittman LLP
rachelle.rennagel@pillsburylaw.com

John Van Son
Pillsbury Winthrop Shaw Pittman LLP
john.vanson@pillsburylaw.com


/s/ James E. Felman
James E. Felman

15