UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                             CASE NO. 3:22-cr-23-BJD-MCR

AARON ZAHN
RYAN WANNEMACHER
_____/

**UNITED STATES' RESPONSE TO DEFENDANT
WANNEMACHER'S POST-*KASTIGAR* HEARING BRIEF
REGARDING HIS STATEMENTS
<u>DURING THE DIAMOND-SALEM HEARING</u>**

The United States of America, via the undersigned, responds to Defendant

Ryan Wannemacher's Post-*Kastigar* Hearing Brief Regarding Diamond-Salem

Hearing Issues (Doc. 288). Wannemacher believes that his statements during the

December 16, 2019, Diamond-Salem Hearing should receive *Garrity*[1] protections.

Defendant Zahn is not making that claim. Wannemacher failed to meet his

burden.

**I.      Overview of Wannemacher's Failure to Meet His Burden**

Wannemacher testified that he believes he would have suffered an adverse

employment action sufficient to trigger *Garrity* protections if he did not attend and

answer questions during the Diamond-Salem Hearing. Wannemacher's position

is based solely on Zahn telling him to attend the Hearing. Merely being told to

---

[1] *Garrity v. New Jersey*, 385 U.S. 493 (1967).

attend a hearing and answer questions is not enough to trigger *Garrity*-type protections. If it was, then Wannemacher (or any JEA employee) would receive *Garrity* protections for every statement he made after Zahn told him to provide information related to his job.

Here, Wannemacher bears the burden of showing that he subjectively believed that he had to attend the Diamond-Salem Hearing and answer questions without any Constitutional protections, and that his belief was objectively reasonable. While it is true that Wannemacher testified that he believed he would be terminated if he did not attend and answer questions during the Diamond-Salem Hearing, his belief was not objectively reasonable.

The Jacksonville municipal code required Wannemacher to attend the hearing, but clearly provides that he did not relinquish his Fifth Amendment privilege against self-incrimination. Wannemacher was not under subpoena. The Diamond-Salem Hearing was not a Special Committee under the rules governing the Jacksonville City Council, thus it was powerless to compel attendance.

Based on his employment agreement with the City of Jacksonville (COJ) effective July 23, 2019 (Govt. Ex. 43B), Wannemacher was not an at-will employee of Zahn. On December 16, 2019, Zahn was powerless to terminate Wannemacher. It was widely known days before the Diamond-Salem Hearing that Zahn was a lame duck CEO, and on his way out. Zahn was preparing to resign, and the JEA Board was preparing to terminate him. Even if Zahn wanted to terminate Wannemacher, he would have had to consult the JEA Board and

Office of General Counsel (OGC). This is supported by the testimony of Melissa Dykes (in her interim CEO capacity) that JEA Board Chair April Green told her to terminate Wannemacher, which occurred on December 27, 2019.

If Wannemacher is correct that his statements during the Diamond-Salem Hearing receive *Garrity* protections, then the Court would have to extend the same protections to every municipal employee in every instance his/her boss requires the employee to attend a public meeting and speak. Nothing in *Garrity* law supports this. Wannemacher himself could not answer questions about the obvious extrapolation of his theory, that is, what happens when the JEA CEO requires the CFO to attend a JEA Board Meeting and brief the Board on JEA's financial condition? Do the statements receive *Garrity* protections? How about every instance when the CFO speaks to the City Council in any setting? Do *Garrity* protections attach there as well? The answers to those questions are of course, "No."

## II.   Factual Background Regarding Wannemacher's Diamond-Salem Claim

On December 5, 2019, Council Members Rory Diamond and Ron Salem sent a letter to Aaron Zahn informing him that they would notice a public meeting for December 16, 2019, at 1:00 pm at City Hall "to thoroughly examine the PUP Plan." Govt. Ex. 46A. This hearing became known as the Diamond-Salem Hearing. The letter requested that JEA employees with the most knowledge of the PUP Plan attend, and that all documents related to the Plan

3

should be produced "not later than close of business on Wednesday, December 11, 2019." *Id.* The document request was made pursuant to the "Florida Public Records Law and the oversight authority of the Jacksonville City Council." *Id.* The letter concluded with seven itemized document requests. *Id.*

On December 10, 2019, Council Members Diamond and Salem held a publicly noticed planning meeting for the December 16, 2019, Hearing, during which it was determined that no subpoenas would be issued. Vol. 6, p. 138, line 8 – p. 139, line 6; Govt. Ex. 46B; Def. Ex. 124. During that planning meeting, General Counsel Jason Gabriel discussed the Jacksonville Municipal Code, specifically Sections 602.1205 and 602.1206, which addressed the requirement of public employees to participate in official investigations related to public affairs. *Id.* No one on the City Council specifically directed Wannemacher to attend the Diamond-Salem Hearing. Vol. 6, p. 140, lines 4 – 14. Councilman Salem did not know for sure whether Zahn would attend the Diamond-Salem Hearing. *Id.* at p. 140, lines 15 – 17.

On December 14, 2019, there was a planning meeting among JEA employees and others at the Dalton Agency to discuss the plan for the Diamond-Salem Hearing. Vol. 6, p. 12, line 11 – p. 13, line 7 (Kerri Stewart); Vol. 8, p. 20, line 17 – p. 21, line 5 (Melissa Dykes). The attendees were Kerri Stewart, Aaron Zahn, Ryan Wannemacher, Melissa Dykes, Kevin Hyde, Herschel Vinyard, Michael Munz, Lynne Rhode, and Sherry Hall. Vol. 6, p. 12, lines 11 – 20. During the Dalton Agency meeting, it became clear that Zahn was planning to

4

attend the Diamond-Salem Hearing, and that he would resign or soon thereafter be terminated from his CEO position. Vol. 1, p. 60, line 17 – p. 61, line 2 (Wannemacher); Vol. 6, p. 13, lines 6 – 25 (Stewart); Vol. 8, p. 21, line 11 – p. 22, line 14 (Dykes). Wannemacher agreed that Zahn stepping down as CEO (whether via resignation or termination) was imminent and public knowledge. Vol. 1, p. 60, line 17 – p. 61, line 2. Wannemacher testified that Zahn instructed him to attend the Diamond-Salem Hearing and to answer questions. *Id.* at p. 32, lines 1 – 7. Zahn determined that Melissa Dykes would not attend the Diamond-Salem Hearing. *Id.* at p. 59, lines 7 – 9; Vol. 6, p. 15, lines 1 – 18 (Stewart); Vol. 8, p. 21, lines 8 – 10 (Dykes). If Zahn was relieved of his duties as CEO, the plan was for Dykes to take over as interim CEO, thus the prevailing view was that she should not attend the Diamond-Salem Hearing. Vol. 6, p. 15, lines 1 – 18 (Stewart).

On December 15, 2019, Councilman Rory Diamond met Aaron Zahn at Southern Grounds Coffee Shop in Neptune Beach. Attorney Daniel Nunn (Nelson Mullins law firm) and Kerri Stewart attended. Vol. 6, p. 17, line 5 – p. 19, line 3 (Stewart); Vol. 6, p. 148, line 18 – p. 150, line 2 (Nunn). Daniel Nunn prepared a two-page memorandum memorializing the meeting approximately one hour after the meeting ended. *Id.*; Govt. Ex. 47. During the meeting, Zahn informed Councilman Diamond that he had become a distraction and intended to resign his position as CEO. *Id.* There was no discussion that witnesses at the Diamond-Salem Hearing would be under oath. *Id.* None of the witnesses were

under oath during the Hearing. Govt. Ex. 45.

The Diamond-Salem Hearing occurred on December 16, 2019. Government Exhibit 45 is a full recording of the Hearing. As set forth below, in the Response to the Garrity Procedures Motion (Doc. 63), the Government quoted extensively from questions and answers involving Zahn and Wannemacher during the Diamond-Salem Hearing.

During cross examination, Wannemacher could not articulate a material difference between being told by Zahn to attend the Diamond-Salem Hearing, and being told to attend and present at a JEA Board Meeting. Vol. 1, p. 68, line 18 – p. 73, line 1. Wannemacher described that refusing to attend JEA Board Meetings "would probably be a career-limiting move." *Id.* at p. 72, lines 12 – 16.

Wannemacher was free to consult a lawyer prior to the Diamond-Salem Hearing, and chose not to. Vol. 1, p. 62, lines 7 – 12. Wannemacher acknowledged the very different setting of his January 3, 2020, statement, that is it was not open to the public, only Wannemacher and lawyers attended, and Wannemacher received *Garrity* admonitions (which he did not receive during the Diamond-Salem Hearing). *Id.* at p. 61, line 24 – p. 62, line 6.

The Government never presented the Diamond-Salem Hearing to the grand jury.

### III.   Wannemacher's Supposed Subjective Belief was not Objectively Reasonable

Wannemacher cannot show that his supposed subjective belief that Zahn

would terminate him if he did not attend and answer questions during the Diamond-Salem Hearing was objectively reasonable. As pointed out in the Government's Memorandum Opposing the Defendants' *Kastigar* Motions (Doc. 132), this is an opportunistic *post hoc* attempt to save Wannemacher's flawed *Kastigar* Motion (Doc. 114) and Motion to Sever (Doc. 102). If the Court concludes that it is not objectively reasonable for Wannemacher to believe that the Diamond-Salem Hearing testimony should receive Garrity protections, this finding will be another fatal blow to these motions.[2]

When analyzing whether a statement is truly compelled, cases "[w]here the state has directly presented the defendant with the Hobson's choice of either making an incriminating statement or being fired" are easier to analyze than cases where there has been no direct threat of termination. *United States v. Camacho*, 739 F.Supp. 1504, 1515 (S.D. Fla. 1990). In the absence of a direct threat, Courts determine whether the statements are compelled based on the individual's belief and, more importantly, the objective circumstances surrounding it. *United States v. Vangates*, 287 F.3d 1315, 1322 (11th Cir. 2002). Thus, for a public employee's

---

[2] As pointed out in the Government's Memorandum Opposing the Defendants' *Kastigar* Motions, Wannemacher's counsel took this position for the first time in an email on July 18, 2022, five days after the undersigned filed the Response to Defendant Wannemacher's Motion To Establish *Garrity* Procedures (Doc. 63) on July 13, 2022, in which the Government thoroughly covered the statements each defendant made therein about the LTI PUP. Wannemacher's opportunistic shift that his statements during the Diamond-Salem Hearing constitute *Garrity* statement remains important because Wannemacher's Diamond-Salem Hearing statements are probably strikingly similar in content to his January 3, 2020, Statement. Now that Zahn is not advancing the theory that his Diamond-Salem statements should receive *Garrity*-type protections, Zahn's *Garrity* statement is no longer the "sole source" of his statements about the LTI PUP, thus Wannemacher's Motion to Sever (Doc. 102) is severely diminished.

statements to be protected under *Garrity*, the employee must have believed that the statements were compelled on the threat of job loss and that belief must have been objectively reasonable at the time the statement was made. *Id.* (*citing United States v. Friedrick*, 842 F.2d 382, 395 (D.C. Cir. 1988)).

In *Vangates*, a Miami Dade officer (Vangates) gave a compelled *Garrity* statement in connection with an assault on a female inmate. *Id.* at 1317. Vangates and other officers were later charged in a federal civil rights criminal case. *Id.* Before the Indictment, the victim filed a section 1983 civil lawsuit seeking damages from the police department and three officers (including Vangates) stemming from the assault. *Id.* at 1318. The civil case went to trial (which was settled while the case was presented to the jury), which was before the Indictment. *Id.* The officers testified in the civil trial. *Id.*

After the Indictment, the government used certain portions of the officers' testimony from the civil trial during the criminal trial. *Id.* at 1319. The jury acquitted two officers, but convicted Vangates on both counts against her. *Id.* Vangates contended that the district court erred in determining the civil trial testimony was not coerced, and thus not protected by Garrity. *Id.* Vangates posited that three factors rendered objectively reasonable her view that she would be sanctioned if she invoked her Fifth Amendment rights during the civil trial: (1) she was subpoenaed to testify; (2) she was required to appear in uniform and was compensated by the county for her time at the trial; and (3) she was not advised

8

that the prior *Garrity* statement was inapplicable or that she could invoke her Fifth Amendment rights. *Id.* at 1322-23.

In applying the objectively reasonable standard, the Eleventh Circuit focused on the conduct of state actors (not private citizens). *Id.* at 1323. The Court held that a subpoena in a civil case did not involve state action, and there was no suggestion that Vangates was required to forgo her Fifth Amendment rights, or that Vangates would be subject to sanctions from the county if she failed to testify in the civil case. *Id.* at 1324. Thus, there was "simply no basis" upon which Vangates had an objectively reasonable belief at the time of the civil testimony that she was required to testify or face punitive consequences. *Id.*; *see also Harrison v. Wille*, 132 F.3d 679, 682 (11th Cir. 1998) (An 'employee's rights are imperilled only by the combined risks of both compelling the employee to answer incriminating questions and compelling the employee to waive immunity from the use of those answers'" (quoting *Arrington v. County of Dallas,* 970 F.2d 1441, 1446 (5th Cir. 1992)).

In sum, two crucial considerations that courts must take into account when reviewing "the totality of the circumstances surrounding the testimony" of public employees (*Vangates,* 287 F.3d at 1322) are whether the employees were informed that they could be sanctioned if they failed to testify[3] and, even if they were so

---

[3]   *See id*. at 1324; *Minnesota v. Murphy*, 465 U.S. 420, 437-38 (1984) ("Unlike the police officers in [*Garrity*], Murphy was not expressly informed during the crucial meeting with his probation officer that an assertion of the privilege would result in the imposition of a penalty"); *United States v. Smith*, 821 F.3d 1293, 1302 (11th Cir. 2016) ("[W]here there is no direct threat, the mere

informed, whether the employees were required to waive their Fifth Amendment rights.[4]

## A.   Wannemacher Was Not Required to Forgo His Fifth Amendment Rights During the Diamond-Salem Hearing

There was no Hobson's choice for Wannemacher at the Diamond-Salem Hearing. Former General Counsel Jason Gabriel testified that the operative provisions of the municipal code governing testimony of municipal employees as to public affairs are sections 602.1205 and 602.1206. Vol 8, p. 134, line 15 – p. 136, line 2; Govt. Ex. 51-1.[5] Section 602.1206 is the operative provision. Subsection (a) states, in substance, that any COJ employee called before a tribunal must answer proper questions concerning the performance of his or her

---

possibility of future discipline is not enough to trigger *Garrity* protection"); *United States v. Wells*, 55 F.4th 784, 797 (9th Cir. 2022) ("The core of the Fifth Amendment is the protection against coerced self-incriminating testimony. And for an employee to be coerced, he must both be objectively threatened with a substantial adverse employment consequence for refusing to incriminate himself and be subjectively aware of that penalty"); *United States v. Hill*, 2010 WL 234798, *7 (N.D. Ga. Jan. 13, 2010) ("Defendant faced no specific threat that such an [adverse employment] action would be taken in his case, and it was by no means a reasonable certainty that it would be").

[4] *See Vangates*, 287 F.3d at 1324; *Harrison*, 132 F.3d at 682; *Hill v. Johnson*, 160 F.3d 469, 471 (8th Cir. 1998) ("The Fifth Amendment is violated only by the combined risks of both compelling the employee to answer incriminating questions and compelling the employee to waive immunity from the use of those answers") (citing *Harrison*, 132 F.3d at 682); *Hill*, 2010 WL 234798 at *8 (Defendant's belief that he might be terminated was not objectively reasonable where "Defendant received no direct order to answer Agent Davis' questions, the relevant jail policy did not specify or promise a particular punishment for its violation, the jail policy did not require an employee to answer a question where the answer would violate his constitutional rights, and no person or policy required Defendant to waive his Fifth Amendment rights . . .").

[5] During the Hearing, the Government admitted two versions of this Exhibit (Govt. Ex. 51 and Govt. Ex. 51-1). The Government erroneously admitted a later codified version (Ex. 51) during Wannemacher's testimony, but corrected the issue and admitted Govt. Ex. 51-1, which was in effect on December 16, 2019 (the date of the Diamond-Salem Hearing). Govt. Ex. 51-1 is the version that Jason Gabriel testified about. The same is true for Govt. Exs. 53 and 53-1. The correct versions of each are Govt. Exs. 51-1 and 53-1.

duties and produce records, with an important caveat, which states "provided, that the officer or employee shall retain his or her privileges and immunities against self-incrimination provided under the Constitution and laws of the state and the United States." Govt. Ex. 51-1. Subsection (b) of the ordinance extends the same Constitutional protections to a directive "by a supervisor related to the employee's performance or fitness to serve." *Id.* Thus, had Wannemacher invoked his Fifth Amendment privilege to refuse to incriminate himself, there is nothing adverse that the City Council (via the Diamond-Salem Hearing) or Aaron Zahn could have done about it. Without the Hobson's choice, no *Garrity* rights attach.

Wannemacher was never subpoenaed to the Diamond-Salem Hearing. In fact, no witness received a subpoena. The minutes of the public December 10, 2019, planning meeting for the Diamond-Salem Hearing show that the Council determined not to compel attendance via subpoena. Govt. Ex. 46B. The rules of the Jacksonville City Council and the municipal code also make clear that an *ad hoc* committee like Diamond-Salem (as of December 16, 2019) was without subpoena power. Govt. Ex. 52 (Council Rules 2.101 – 105, 2.201 – 214); Govt. Ex. 53-1 (Sec. 134.101 – 108). Standing and Special Committees can issue subpoenas in accordance with Chapter 134 of the Ordinance Code. Govt. Ex. 52 (Rule 2.208). The Diamond-Salem group (as of December 16, 2019) was neither. Had the Council even wanted to issue subpoenas for the Diamond-Salem

11

Hearing, it was powerless to do so.[6] Thus, the only thing requiring Wannemacher to physically attend was Zahn directing him to attend. And, the municipal code makes clear that Zahn could not require Wannemacher to forgo his Constitutional privilege against self-incrimination.[7] There was no Hobson's choice for Wannemacher. *See Murphy*, 465 U.S. at 438 ("The court [below] relied instead on the fact that Murphy was under legal compulsion to attend the meeting and to answer truthfully the questions of a probation officer who anticipated incriminating answers. Such compulsion, however, is indistinguishable from that felt by any witness who is required to appear and give testimony, and, as we have already made clear, it is insufficient to excuse Murphy's failure to exercise the privilege in a timely manner") (citation omitted); *Hill*, 160 F.3d at 471 ("<u>As long as a public employer does not demand that the public employee relinquish the employee's constitutional immunity from prosecution</u>, however, the employee can be required to either testify about performance of official duties or to forfeit employment") (emphasis added) (citing and quoting *Lefkowitz v. Cunningham,* 431 U.S. 801, 806 (1977) ("Given 'the important public interest in securing from public employees an accounting of their public trust[,][p]ublic employees may

---

[6]  Even if a standing committee "or other board or body authorized to issue subpoenas" determines to issue them, it requires "the vote of a majority of the qualified members of the authorized body." Govt. Ex. 53-1 (Municipal Ordinance Section 134.101).

[7]   Furthermore, City Council Member Ronald Salem, co-chair at the Diamond-Salem Hearing, testified that he knew of no reason that Wannemacher would not have been able to assert his Fifth Amendment rights if he had been asked a question that he felt might incriminate him. Vol. 6, p. 142, lines 20 – 23.

constitutionally be discharged for refusing to answer potentially incriminating questions concerning their official duties <u>if they have not been required to surrender their constitutional immunity</u>'" (*Hill*, 160 F.3d at 471) (emphasis added))).[8]

**B.    Zahn Did Not Have Complete Authority to Terminate Wannemacher**

When Zahn convinced the JEA Board to make Wannemacher a contracted employee with the COJ, Zahn removed his sole ability to terminate Wannemacher. The JEA Board authorized Wannemacher's contract (and others)

---

[8]   In his brief, Wannemacher cites *Gardner v. Broderick*, 392 U.S. 273, 277-78 (1968), for the proposition that "public employees coerced to respond to such questions [about the performance of their official duties] are immune from their responses to these questions being used against them." Doc. 288 at 23. However, the court in *Gardner* made clear that the employee in that case was dismissed "not for failure to answer relevant questions about his official duties, but for refusal to waive a constitutional right." *See Gardner*, 392 U.S. at 278. In the present case, Wannemacher was never asked to waive his constitutional rights and he presented no evidence, even in his own testimony, that he had any belief, reasonable or not, that he was required to waive his constitutional rights. In a similar vein, Wannemacher quotes *Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation*, 426 F.2d 619, 627 (2d Cir. 1970), for the proposition that "public employees do not have an absolute constitutional right to refuse to account for their official actions and still keep their jobs; their right, conferred by the Fifth Amendment itself, as construed in *Garrity*, is simply that neither what they say under such compulsion nor its fruits can be used against them in a subsequent prosecution." Doc. 288 at 23. However, Wannemacher left out the beginning of that sentence, which reads, "The proceeding here involved no attempt to coerce relinquishment of constitutional rights . . . ." *Uniformed Sanitation Men*, 426 F.2d at 627; *see also id.* ("Justice Fortas stated in so many words that if a public officer is asked about performance of his official duties <u>and is not required to waive immunity</u>, the privilege is not a bar to his dismissal for refusal to answer") (emphasis added); *see also <u>Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation</u>*, 392 U.S. 280, 283 (1968) ("Petitioners were not discharged merely for refusal to account for their conduct as employees of the city. They were dismissed for invoking and refusing to waive their constitutional right against self-incrimination. . . . [I]f New York had demanded that petitioners answer questions specifically, directly, and narrowly relating to the performance of their official duties on pain of dismissal from public employment <u>without requiring relinquishment of the benefits of the constitutional privilege</u>, and if they had refused to do so, this case would be entirely different. In such a case, the employee's right to immunity as a result of his compelled testimony would not be at stake") (emphasis added).

during the July 23, 2019, Board Meeting. Govt. Exs. 20(p)(1), 20(q), & 43B. Wannemacher's employment agreement with the COJ, effective July 23, 2019, and signed by JEA Board Chair April Green, specifically stated in the seventh "Whereas" Clause that "the Board is tasked with appointing a Chief Financial Officer to operate the eight largest community-owned electric utility company in the United States and largest in Florida…." Govt. Ex. 43B, p. 1. Section III of the employment agreement pertains to termination. *Id.* at pp. 4 – 6. That provision sets forth the grounds for termination for "Cause" and "Good Reason." *Id.* Together with the language in the preamble (Whereas Clauses), it is clear that Zahn alone could not terminate Wannemacher if Wannemacher did not attend the Diamond-Salem Hearing, or invoked his Fifth Amendment rights during questioning.

Former General Counsel Jason Gabriel (who was in that position during Diamond-Salem Hearing and during the unraveling of the ITN) testified that because Wannemacher's contract was in place, there would have been a collaborative process with the JEA Board and OGC to terminate Wannemacher. Vol. 8, p. 131, line 23 – p. 133, line 15. When Wannemacher was terminated effective December 27, 2019, that collaborative process occurred. Specifically, Board Chair April Green directed Dykes to terminate Wannemacher. Vol. 8, p. 47, line 17 – p. 49, line 14. Board Member Kelly Flanagan also contacted Dykes and stated that she had lost confidence in Wannemacher and that he should be terminated. *Id.*

Thus, because of the employment agreement, Zahn alone did not have the power to terminate Wannemacher. Any contrary view is not objectively reasonable.

### C.    Zahn Did Not Have the Present Ability to Terminate Wannemacher

On the date of the Diamond-Salem Hearing, it was clear that Zahn's job as JEA CEO was in significant peril. The Council Auditor had exposed the arithmetic of the LTI PUP in connection with recapitalization, a Council inquiry into the LTI PUP had been scheduled (Diamond-Salem), and the ITN was on the brink of cancellation (which occurred on December 24, 2019). It was clear that the JEA Board would be discussing Zahn's future as the CEO at the regularly scheduled Board Meeting the day after the Diamond-Salem Hearing. In the two days leading up to the Diamond-Salem Hearing, Zahn told Daniel Nunn, Kerri Stewart, and the group present at the Dalton Agency that he knew his days as the CEO were numbered, and that he intended to resign. This makes the argument that Wannemacher had an objectively reasonable belief that Zahn alone could terminate him even more far-fetched. In sum, it was public knowledge that Aaron Zahn was a powerless and lame duck CEO.

### D.    Wannemacher's View of *Garrity* Protections Would Extend Those Protections to Unprecedented Levels

Under Wannemacher's view of *Garrity* protections, every public employee would receive *Garrity*-type protections every time his or her supervisor told the

employee to speak in a public forum about their job performance. That is not the law, and any such interpretation is not objectively reasonable. *See Vangates*, 287 F.3d at 1324 ("The general directive to cooperate was not sufficiently coercive to create an objectively reasonable belief that Vangates would be sanctioned if she invoked her Fifth Amendment rights"). As stated above, during cross-examination, Wannemacher could not meaningfully distinguish between being told to attend the Diamond-Salem Hearing and being told to attend and present at a monthly JEA Board Meeting. Vol. 1, p. 68, line 18 – p. 73, line 1. Wannemacher attempts to rehabilitate this in the post-Hearing brief, but to no avail. Wannemacher asks this Court to extend *Garrity* protections simply because Zahn told him to attend the Diamond-Salem Hearing and answer questions. As illustrated, that is not enough to trigger *Garrity* protections. If the Court rules in Wannemacher's favor as to Diamond-Salem, the expansion of *Garrity* protections to public employees would be unprecedented. There would be no reason for actual *Garrity* statements where *Garrity* warnings were given, because any instance where a public employee was told to attend and speak would carry *Garrity* protections. The exception would swallow the rule.

Wannemacher points to testimony of Melissa Dykes regarding the nature of the Diamond-Salem Hearing, including the political climate. However, what Wannemacher does not discuss is Dykes' response to the Court's questions about appearance before Council Members, and that she did that "roughly a dozen" times, and further testified that it was not "unusual" for other executives to

16

appear before Council Members. Vol. 8, p. 51, lines 2 – 22. Dykes further testified that as the COO, it was part of her job to go before the JEA Board and City Council to present when instructed. Vol. 8, p. 23, line 19 – p. 24, line 4. There is no argument otherwise for the CFO position. Thus, not only does the municipal code require the same (and specifically provides that employees do not thereby forgo their Constitutional rights), but it is also known among the executives that such presentations are part of the job. It would make no sense for *Garrity* protections to extend to these presentations.

### E.   Wannemacher Continues to Equate Exposure with Taint

In his post-Hearing brief, Wannemacher presses the incorrect position that because the Prosecution Team watched the Diamond-Salem Hearing (a publicly noticed hearing that any citizen could watch) the Indictment is tainted. As discussed in the Government's post-hearing brief (Doc. 290), exposure does not equal taint.

The Eleventh Circuit has held that "[t]he focus of the inquiry under *Kastigar* … is not whether the prosecutor was aware of the contents of the immunized testimony, but whether he used the testimony in any way to build a case against the defendant." *United States v. Caporale*, 806 F.2d 1487, 1518 (11th Cir. 1986) (trial prosecutor had read prior immunized grand jury testimony); *see also United States v. Dynalectric Co.*, 859 F.2d 1559, 1578-80 (11th Cir. 1988) (no Fifth Amendment violation even though trial prosecutor was the same prosecutor who heard immunized grand jury testimony where prosecutor submitted an

"affidavit [that] meticulously linked the independent sources of evidence (i.e., the 50 exhibits) to each piece of evidence presented to the indicting grand jury and to be adduced against Paxson at trial which conceivably was directly or indirectly revealed in Paxson's immunized testimony"); *United States v. Vander Luitgaren*, 556 F. Supp. 2d 1313, 1319-20 (M.D. Fla. 2008) ("Mere awareness of the exculpatory evidence by Agent Woolard or the grand jury does not invalidate the indictment. . . . [I]t does not violate the Fifth Amendment to have a testifying witness who is aware of Defendant's immunized statements testify before the grand jury").

The Government never presented Wannemacher's or Zahn's statements during the Diamond-Salem Hearing to the grand jury.

### F.   Wannemacher Lied During the Diamond-Salem Hearing and Did Not Make Statements Useful in the Prosecution

Wannemacher seeks *Garrity* protections for statements that were essentially useless. In its post-Hearing brief (Doc. 290), the Government set forth the independent sources from where it obtained its evidence to present to the grand jury and at trial. Wannemacher opportunistically tries to label his statements during Diamond-Salem as *Garrity*-protected, but does not want the Court to evaluate what he actually said. That is because the nature of the statements are obvious - - they were self-serving and useless. *See*, *e.g.*, *United States v. Caporale,* 806 F.2d at 1518 (immunized testimony "was self-serving and of no real value in the subsequent investigation"); *United States v. Gallo*, 863 F.2d 185, 190 (2d Cir.

1988) ("[I]t should be noted that the nature of Gallo's grand jury testimony makes any claim of its direct or indirect use untenable. The testimony consisted mostly of denials and ambiguous answers. In short, there was nothing to use").

In the Government's Response to Wannemacher's *Garrity* Procedures Motion (Doc. 63), the Prosecution Team posed the question, "how could the Government make derivative use of information that Zahn and Wannemacher did not provide?" This was aimed at the Defendants' failure to divulge the critical spreadsheets showing LTI PUP arithmetic when tethered to recapitalization of JEA during the Diamond-Salem Hearing. Govt. Exs. 20(a)(1) & 20(l)(1). Zahn is not claiming *Garrity* protections for his statements during the Diamond-Salem Hearing; only Wannemacher is. So, to the extent they were useful, the Government was free to make derivative use of Zahn's statements. However, like Wannemacher, Zahn basically lied. Neither individual said anything worth using, or stated anything that was not obvious from watching publicly available Board Meetings. The following are excerpts from the Diamond-Salem Hearing (Zahn's statements are included for context):

- Zahn stated that he "made an error in judgment…. The motives of the long-term employee plan at inception were pure, but the moment that JEA's Board contemplated recapitalization, I as the CEO should have recommended that the long-term performance plan would be better timed after a final decision was made for JEA's future. Instead, JEA's leadership continued the mechanics of legal, ethical, and confirmatory diligence around this long-term plan. The delay in cancelling this plan and the contemplation of potential impacts of recapitalization on the plan were my mistake. In consultation with OGC and advisors between August and the end of October, JEA's leadership arrived at the correct conclusion…."

19

- When asked who "pulled the trigger" on the "PUP plan," Zahn stated that he did not know. Wannemacher said the same. Subsequently, Zahn changed course and said, "Yeah, I signed off on that [the PUP]."

- Council Member Diamond asked, "Who else was involved, do you know, with the evaluations of the PUP plan up until June 18? Can you just kinda' list off people who might've been involved, or you know were involved?"

  o Zahn answered, "Sure so, Board members. I keep them apprised of the work that the staff does on a weekly basis oftentimes – if not weekly, once every other week to give them an update in terms of on how staff and consultants are performing on directives that they've provided…. The Compensation Committee at the time…myself, Ryan Wannemacher, Angie Hiers, Pat Maillis, Willis Towers Watson…. I'm sure there were a lot of people that were being consulted with on different aspects based on their functional area."

  o Council Member Diamond stated, "What I'm trying to figure out here is at some point we get an equation that says how you value each PUP, and I'm trying to figure out if that equation has been created yet, Mr. Wannemacher, do you know?"

  o Wannemacher responded, "I don't recall at this time if that equation had been formulated yet."[9]

  o Council Member Diamond asked, "Were you looking at the math behind this plan at this point?"

  o Wannemacher answered, "I don't know that we had determined anything other than a broad sizing at this point in the record."[10]

  o Council Member Diamond asked, "What does that mean, 'broad sizing'?"

  o Wannemacher explained, "In terms of the total kind of annual compensation – the target for the $3.4 million that's referenced here. And by the way, I think this was a reference point. I don't know that

---

[9] Government Exhibits 20(a)(1) (The Performance Unit Scratch Sheet) and 20(l)(1) (the "Notes.xlsx" spreadsheet) show this statement was untruthful, and thus useless from a derivative use perspective.

[10] This is also false.

this was where we ended up ultimately in the context of the conversion."

- o Council Member Diamond followed up, asking, "So, there wasn't a calculation that spit out $3.4 million, it was a target?"

- o Wannemacher replied, "I believe so, at this time."

- Council Member Salem asked, "Who put the PUP on the July 23rd agenda?"

  - o Zahn responded, "Myself, the entire senior leadership team, and OGC review all Board documents before they get submitted, as well as the other individual Board members will review the materials ahead of time so that they're familiar with the materials prior to receiving them as a complete package."

  - o Council Member Salem asked, "Do you know when the Board packet for this particular meeting was completed?"

  - o Zahn answered, "I don't know."

  - o Council Member Salem followed up, "I've spoken to several Board Members who have reached out to me, they tell me they got it late-Friday prior to the Tuesday meeting. Do you know if the Board Members were briefed on the PUP plan prior to the meeting?"

  - o Zahn answered, "Yes, it's a practice to talk to individual Board members and make them apprised of significant elements that are coming up at Board meetings."

  - o Council Member Salem stated, "I understand that's the practice, and I was told that normally occurs – for this meeting, though, I'm talking about."

  - o Zahn responded, "From my recollection, yes. I don't recall deviating from that practice."

- Later in the hearing, Wannemacher described the PUP as of July 23, 2019, as a "draft," even though the JEA Board approved the plan prospectively. Wannemacher then admitted that even as of mid-November 2019, the PUP had no cap, and that the Council Auditor was "correct" about that.

21

- Later in the hearing, Council Member Salem pressed Wannemacher on whether he performed "specific calculations."

  - Council Member Salem stated, "I mean specific numbers…. Did you perform any calculations yourself?"

  - Wannemacher answered, "So, we did provide those calculations to the Council Auditor."[11]

  - Council Member Salem asked, "But prior to it being presented to the Board, prior to July 23, did you perform those calculations? Either on a legal pad or on a white board in your office, or somewhere?"

  - Wannemacher stated, "Yeah, I think at some point along the way I looked at the expected forecast and ran those numbers. I don't know that I – frankly, the formula itself is relatively straightforward as it relates to the calculation. It's straight out of our financial statements and its direct line items. So, it's not a complicated spreadsheet necessarily…."[12]

Zahn and Wannemacher did not say anything that was not already obvious, and when they were asked direct questions about equations and calculations, Wannemacher initially lied, then referred to communications with the Council Auditor, which fell within the ambit of the Government's grand jury subpoena to JEA. Wannemacher cannot point to anything (nor does he in his post-Hearing brief) useful that the Government could have gleaned in terms of evidentiary leads from his Diamond-Salem testimony alone. Even if the Court determines these statements are *Garrity*-protected (which it should not),

---

[11] Which the Government obtained from the grand jury subpoena to JEA, and introduced through the testimony of Jeff Rodda and Kim Taylor.

[12] These exchanges spanned various times throughout time stamps 7:50 to 1:15:35 during the Diamond/Salem Hearing. Govt. Ex. 45.

Wannemacher's position fails under the usefulness analysis. Similar to the Second Circuit's analysis in *Gallo*, there was simply nothing to use.

## IV.   Conclusion

Wannemacher did not have a true Hobson's choice when he decided to answer questions during the Diamond-Salem Hearing. Even with required attendance, Wannemacher could have invoked his Fifth Amendment privileges, and there is nothing Zahn could have done about it. Zahn did not have sole authority to terminate Wannemacher because of Wannemacher's employment agreement with the COJ. Zahn was a powerless CEO on his way out, as the process to remove him because of his failed leadership during the ITN, and the conjuring up of a bonus plan to enrich himself and others, was underway. Zahn had no real authority to do anything at that point, much less terminate subordinates. The process that Dykes underwent to terminate Wannemacher makes clear that the decision essentially rested with the JEA Board. Wannemacher's *post hoc* and purported subjective view that Zahn would terminate him or he would suffer an adverse employment action was not objectively reasonable. Finally, the useless nature of Wannemacher's statements during the Diamond-Salem Hearing is also fatal to his motion. The Court should find that Wannemacher's statements at the Hearing were not protected by *Garrity.* The Indictment should stand.

Respectfully submitted

ROGER B. HANDBERG
United States Attorney


*/s/ Tysen Duva*
Tysen Duva
Assistant United States Attorney
Florida Bar No. 0603511
Arnold B. Corsmeier
Assistant United States Attorney
Florida Bar No. 869139
300 N. Hogan Street, Suite 700
Jacksonville, Florida 32202
Telephone: (904) 301-6300
Facsimile:    (904) 301-6310
E-mail: Tysen.Duva@usdoj.gov
        Chip.Corsmeier@usdoj.gov


## CERTIFICATE OF SERVICE

I hereby certify that on July 5, 2023, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a

notice of electronic filing to the following:

Counsel of Record

*s/ Tysen Duva*
Tysen Duva
Assistant United States Attorney